**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 19 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LANTEC, INC., a Utah corporation; LANCOMPANY
INFORMATICA LTDA., a Brazil corporation;
LANTEC INFORMATICA LTDA., a Brazil
corporation; LANTRAINING INFORMATICA
LTDA., a Brazil corporation,

    Plaintiffs - Counter-Defendants - Appellants,

v.

NOVELL, INC., a Delaware corporation,

    Defendant - Counter-Claimant - Appellee.

No. 01-4109

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:95-CV-97-ST)**

---

P. Bruce Badger (Robert A. Garda and Stanford B. Owen of Fabian & Clendenin,
Salt Lake City, Utah; and Evan A. Schmutz of Hill, Johnson & Schmutz, P.C.
Provo, Utah, with him on the briefs) of Fabian & Clendenin, Salt Lake City, Utah,
for Plaintiffs - Counter-Defendants - Appellants.

Stanley J. Preston (R. Brent Stephens and Maralyn M. Reger with him on the
brief) of Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendant -
Counter-Claimant - Appellee.

---

Before **KELLY,** Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HARTZ**,
Circuit Judge.

---

**BRORBY**, Senior Circuit Judge.

_____

While the Microsoft antitrust case has captured much media attention, this antitrust case is just as important to the computer program developers involved. Here, the Lantec companies appeal a district court order dismissing state-law contract and promissory estoppel claims on summary judgment. The Lantec companies also argue the district court incorrectly granted Novell, Inc.'s ("Novell") motion for judgment as a matter of law on several antitrust claims. The facts and legal issues in this case are complex and will be discussed at length. However, the Lantec companies' basic argument is Novell drove them out of business.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## FACTUAL BACKGROUND

Beginning in the mid-1980s, Novell sold a network operating system for connecting computers called NetWare. James E. Gaskin, Mastering NetWare 5, 20 (1999). A network operating system "is the software used to connect computers and other devices, share resources, transfer files, and perform other network services and activities." Sue Plumley, Network Administration Survival

Guide 25 (1999). It controls access to the network and allows users to share data. *Id*.

Novell also distributed Message Handling System and Global Message Handling System. These products were messaging transport agents[1] for NetWare. A messaging transport agent essentially acts as the computer version of a post office; it routes, stores, and delivers messages sent by e-mail or groupware programs.[2] Message Handling System and Global Message Handling System were designed to be used with the NetWare operating system and groupware programs. In addition to routing messages, Message Handling System and Global Message Handling System allow groupware to access security features, printing, file sharing, and other data shared through the NetWare operating system.

Although Novell began marketing Message Handling System and Global

---

[1] Throughout the record and the briefs, messaging transport agents are variously referred to as messaging engines, messaging transcript agents, and messaging transfer agents. Some of the discrepancies may be attributed to the fact some testimony was translated from Portuguese to English. Because "messaging transport agent" appears to be the preferred term, we have chosen to use it in this opinion.

[2] The parties agree the term "groupware" refers to any software containing an e-mail application plus one other collaborative application such as calendaring, scheduling, or task management.

Message Handling System in the early 1990s, it did not immediately develop groupware programs to be used with Message Handling System and Global Message Handling System. Instead, independent software programers developed this groupware. By making the application program interfaces[3] in Message Handling System and Global Message Handling System publicly available, Novell enabled independent programers to write groupware. Software designed using the Message Handling System and Global Message Handling System application program interfaces can communicate with Message Handling System or Global Message Handling System and therefore with NetWare.

In addition to providing application program interfaces, Novell participated in a group known as the Message Handling System Alliance. The Alliance was a group of independent software developers interested in Message Handling System. Through this group, Novell helped independent software programers

---

[3] Application program interfaces allow a programer writing an application to instruct an operating system or another program to carry out specific tasks. In essence, application program interfaces act as building blocks. When programers have the application program interfaces, they can create software to complete tasks through the program providing the interfaces by putting the interfaces together. *See United States v. Microsoft Corp.*, 253 F.3d 34, 53 (D.C. Cir.), *cert. denied*, 122 S. Ct. 350 (2001). If programers do not have the application program interfaces they must completely recreate instructions for the tasks with original code. *Id.*

market, and provide technical support for, their groupware products.

Lantec, Inc. ("Lantec"), LanCompany Informatica Ltda. ("LanCompany"), Lantec Informatica Ltda. ("Lantec Brazil"), and LanTraining Informatica Ltda. ("LanTraining") (collectively "the Lantec companies") were interested in making groupware using the application program interfaces in Message Handling System and Global Message Handling System. All the Lantec companies grew out of a predecessor Brazilian software development company called DataRede. Originally, DataRede worked with Novell to distribute NetWare in Brazil. At that time, Brazil refused to allow foreign software developers access to the Brazilian market unless there were no similar software products designed by Brazilian companies. DataRede conducted similarity tests to help convince Brazilian regulators to allow Novell's products in Brazil.

One of the contract disputes in this case arises from a February 1990 letter from Novell to DataRede that discusses DataRede's participation in the similarity tests. LanCompany now refers to this letter as the "DataRede Agreement" and claims Novell breached the Agreement by failing to fully compensate DataRede or its successor company for conducting the similarity tests.

Although disputes subsequently developed, DataRede began doing more work with Novell. As DataRede's Novell business increased, it transferred that business to three new companies headed by Marcello Thoillier and other partners in the DataRede organization. Lantec Brazil was created to develop software compatible with Novell products, particularly NetWare and Message Handling System. LanCompany was to market Novell software, and LanTraining was to train people to use Novell products. In Utah during 1991, Mr. Thoillier and his associates incorporated Lantec, an American sister corporation to the Brazilian companies. Lantec was charged with translating Lantec Brazil's products from Portuguese to English. Lantec also began looking for companies to manufacture, market, and distribute the products in the United States.

The Lantec companies developed XPostWare, a package of software containing menu, e-mail, fax, and calendaring applications. XPost, the e-mail portion of XPostWare, used Novell's Message Handling System to transport messages using NetWare. Lantec and Lantec Brazil each entered an Original Equipment Manufacturer Agreement with Novell to allow them to package XPostWare with Novell's NetWare and Message Handling System.

Just as Lantec was on the verge of offering its XPostWare package in the

United States, Novell and WordPerfect announced plans to merge. At this point, the relationship between Novell and the Lantec companies became strained. The day of the announcement, Mr. Thoillier indicated he was going to shut down Lantec's business. The next day, the Lantec companies put all their marketing, advertising, and packaging projects on hold. Less than a month later, a Novell executive left Mr. Thoillier a voice message stating other executives at Novell wanted to terminate the relationship between Novell and the Lantec companies. Although Novell subsequently sent a letter stating it was willing to work with the Lantec companies and continue the Original Equipment Manufacturer Agreements, Lantec and Lantec Brazil argue the letter should be discounted because another Novell executive later threatened to drive the Lantec companies out of business. The Lantec companies never shipped XPostWare and made no attempt to actively sell XPostWare after the Novell/WordPerfect merger.

The Novell/WordPerfect merger changed Novell's approach to Message Handling System and Global Message Handling System. After the merger, Novell released GroupWise. Rather than being solely a messaging transport agent like Message Handling System and Global Message Handling System, GroupWise contains both the messaging transport agent and groupware. This software design strategy was similar to WordPerfect's pre-merger messaging software which also

contained both the messaging transport agent and groupware. Ultimately, Novell

quit developing Message Handling System and focused solely on GroupWise.


## PROCEDURAL HISTORY

Based on these facts, in 1995, Lantec filed a complaint in federal district

court in Utah. More than a year later, Lantec Brazil, LanCompany, and

LanTraining joined the suit as plaintiffs. The Lantec companies brought state law

tort claims, breach of contract claims, and a promissory estoppel claim. In

addition, they alleged Novell violated federal and state antitrust laws by (1)

unlawfully merging with WordPerfect; (2) contracting combining, or conspiring

to unreasonably restrain trade; (3) monopolizing, attempting to monopolize, and

conspiring to monopolize the worldwide groupware for NetWare market; (4)

unlawfully using its monopoly power in the network operating system market to

gain a competitive advantage in what the Lantec companies designate the

"groupware for NetWare market"; and (5) unlawfully tying the sale of its

groupware to NetWare. *See* 15 U.S.C. §§ 1, 2, 14, 18; Utah Code Ann. § 76-10-

914(1), (2).


Prior to trial, the district court granted Novell's motion for summary

judgment on the tort, contract, and promissory estoppel claims. It also dismissed

the antitrust claims brought by LanCompany and LanTraining for lack of standing. The case, however, proceeded to trial on the remaining antitrust claims. After the Lantec companies presented their case to the jury, Novell moved for judgment as a matter of law. The district court ruled in Novell's favor. *Lantec, Inc. v. Novell, Inc.*, 146 F. Supp. 2d 1140, 1142 (D. Utah 2001).

On appeal, the Lantec companies raise several issues. We first address the contract and promissory estoppel issues and then examine the antitrust issues.

## <u>CONTRACT AND PROMISSORY ESTOPPEL CLAIMS</u>

The Lantec companies argue the district court erred in granting summary judgment on (1) the breach of contract claim based on the "DataRede Agreement"; (2) the breach of contract claim based on the Original Equipment Manufacturing Agreements; (3) the breach of the oral "Message Handling System Agreement" claim; and (4) the promissory estoppel claim.

We review a grant of summary judgment *de novo*. *Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In applying this standard, we examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Clinger v. New Mexico Highlands Univ.*, 215 F.3d 1162, 1165 (10th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001).

We will address the Lantec companies' contract and promissory estoppel arguments in light of this standard.

I.     THE "DATAREDE AGREEMENT"

LanCompany argues the district court erred in granting summary judgment on its claim Novell breached the "DataRede Agreement."[4]  The "DataRede Agreement" claim is based on a February 7, 1990 letter from Novell's director of new business development to DataRede.  Prior to the letter, DataRede had, under the direction of Novell, conducted similarity tests necessary to allow Novell to distribute NetWare in Brazil.  After the completion of the similarity tests, Novell sent the February letter promising a license to build network interface cards with

---

[4]  Paulo Rufino, a former president of DataRede, testified DataRede assigned the agreement to LanCompany.  Consequently, LanCompany is the sole entity appealing this issue.

no up-front fee. LanCompany refers to this letter as the "DataRede Agreement".

Specifically, the letter states: "Novell has agreed to the following measures as recognition of DataRede's special contribution to the registration and approval of NetWare .... No up-front fee for NE1000 & NE2000." NE1000 and NE2000 are network interface cards. They are essentially hardware that allows a computer to communicate with a network. Although Novell had the technology for these cards, it typically licensed the technology to other hardware manufacturers rather than producing the cards itself. LanCompany contends Novell breached the Agreement by failing to deliver the license.

The district court granted summary judgment in favor of Novell, concluding there was no contract because there was no consideration for the letter. The court found "there was no consideration for the claimed contract because the benefits granted by the letter were past consideration for DataRede's earlier participation in the Brazilian registration process, a process completed two months before the ... [l]etter." Furthermore, the court said even if the "letter was an agreement, the evidence is that Novell did comply with the terms of the letter." The district court later denied a request for rehearing on this issue.

LanCompany argues there was sufficient consideration for an enforceable contract because the parties had intended Novell "to compensate DateRede for its participation in the similarity test."LanCompany explains "[e]ven though the DataRede Agreement is dated after the similarity test, Novell's promises that were memorialized in the document were not made independent of DataRede's promised performance." LanCompany claims "DateRede, therefore, had a claim for its efforts, and even if the claim for a reward might not have been enforceable, the surrender of its claim in exchange for the DataRede Agreement was sufficient consideration for the contract." Although LanCompany does not specifically mention accord and satisfaction, it directs us to accord and satisfaction cases.

Generally, past services cannot serve as consideration for a subsequent promise. *Dementas v. Estate of Tallas ex rel. First Security Bank,* 764 P.2d 628, 633 (Utah Ct. App. 1988) ("Events which occur prior to the making of the promise and not with the purpose of inducing the promise in exchange are viewed as 'past consideration' and are the legal equivalent of 'no consideration.'"); *Jensen v. Anderson*, 468 P.2d 366, 368 (Utah 1970) ("Past services, when rendered under ... circumstances as to create no legal liability, are not consideration for a subsequent promise" (citations omitted).). Utah law does, however, enforce a subsequent promise based on completed services when the

completed service was not meant to be gratuitous and the subsequent promise meets the requirements of an accord and satisfaction. *See England v. Horbach*, 905 P.2d 301, 304 (Utah Ct. App. 1995), *rev'd on other grounds*, 944 P.2d 340, 344 (Utah 1997); *Jensen,* 468 P.2d at 368 n.6. "A party seeking to prove an accord and satisfaction must show (1) an unliquidated claim or a bona fide dispute over the amount due; (2) a payment offered as full settlement of the entire dispute; and (3) an acceptance of the payment as full settlement of the dispute." *ProMax Dev. Corp. v. Raile*, 998 P.2d 254, 259 (Utah 2000).

We are not persuaded by LanCompany's arguments. The "DataRede Agreement" lacks sufficient consideration to constitute an enforceable contract. LanCompany readily admits DataRede completed the registration tests before Novell sent the letter allegedly creating the DataRede Agreement. Although LanCompany's brief suggests the letter simply "memorialized" promises made prior to the completion of the registration tests, there is no evidence in the record to support this suggestion. Viewed in the light most favorable to LanCompany, the record merely reveals testimony the parties expected DataRede would receive some compensation. But, the parties had not agreed upon the terms of DataRede's compensation before Novell sent the February 7, 1990 letter. We, therefore, will enforce the promises in the letter only if they meet the

requirements of an accord and satisfaction.

Even assuming LanCompany is correct in its assertion there was a dispute as to the compensation Novell owed LanCompany for conducting the similarity tests, we cannot conclude the DataRede Agreement amounts to an enforceable accord and satisfaction. In this case, LanCompany needed to show the agreement was in satisfaction of the dispute. *See ProMax Dev.*, 998 P.2d at 259. But, there is no indication DataRede or LanCompany ever surrendered any of its potential claims against Novell. In fact, the letter embodying the DataRede Agreement shows the Agreement was not in satisfaction of any claims. As the letter itself explains:

> In the course of events, DataRede made special requests to Novell .... These requests were made without prior agreements, and, in some cases, without a precise definition of the scope or [sic] the request. Some of the requests have been granted, others have been subject to negotiation, and still others must be further defined.

As the letter states, negotiations were still underway concerning DataRede's requests made incident to the registration tests. Furthermore, LanCompany does not direct us to any other evidence suggesting the "DataRede Agreement" was reached in satisfaction of any claims or in full settlement of any dispute. There is simply no evidence to support LanCompany's contention it surrendered potential claims against Novell to receive the benefits in the February 1990 letter.

-14-

Consequently, the alleged "DataRede Agreement" fails for lack of consideration.

Because we conclude the promises in the letter lack consideration, we need not consider whether Novell breached the alleged agreement. The district court was correct in granting summary judgment on the breach of the "DataRede Agreement" claim.

II.   BREACH OF ORIGINAL EQUIPMENT MANUFACTURER AGREEMENT

Lantec and Lantec Brazil claim Novell breached its Original Equipment Manufacturer Agreements. These Agreements allowed Lantec and Lantec Brazil to package their products with Novell's NetWare and Message Handling System products. Lantec and Lantec Brazil claim Novell terminated the Agreements in April 1994 when Ron Palmeri, a Novell executive, left Mr. Thoillier a voice mail message. They also claim Tom Pesut, a Novell executive, subsequently confirmed the repudiation when he "declared that [Novell] would refuse to do business in the future with any of the Lantec Companies."

The district court granted Novell's motion for summary judgment dismissing the claims involving the Original Equipment Manufacturer Agreements because there was "no showing of anticipatory repudiation by Novell." The court

concluded the Agreements "required written notice of termination and none was given." In addition, the court noted Novell sent a letter reaffirming the Agreements and "demonstrated a willingness to continue with the agreement[s] as [they] existed or to modify [them] in a way that would be acceptable to all" at a subsequent meeting with the Lantec companies. The district court later denied Lantec and Lantec Brazil's motion for reconsideration on this issue.

We will consider each fact relevant to Novell's alleged wrongful breach of the Original Equipment Manufacturer Agreements in turn. We first consider whether Mr. Palmeri's telephone message constitutes triable evidence indicating Novell repudiated the Original Equipment Manufacturer Agreements. Next, even if Novell did repudiate, we ask whether Novell successfully retracted the repudiation. Finally, we address whether the district court abused its discretion in striking a portion of an affidavit Lantec and Lantec Brazil intended to use to establish Mr. Pesut's alleged threat to refuse to deal with the Lantec companies. Ultimately, we affirm the district court's decisions related to the Agreements.

A.     Voice Mail Message

In April 1994, Mr. Palmeri of Novell left a voice mail message for Mr. Thoillier. In relevant part, it stated:

> I had a meeting with Tom Pesut yesterday and Jim Sullivan, who is
> the director of channel sales and they want to terminate the
> relationship between the companies. I want to let you know.  Leave
> me a voice mail and let me know that you did get in fact this
> message,  I don't want you to be surprised when the letter comes
> from our legal.  OK?  I'll try to give you a ring back again but it is
> just gonna be a lit [sic] tough to reach for the next couple of days.

Lantec and Lantec Brazil argue this message could reasonably be viewed as an anticipatory repudiation of the Original Equipment Manufacturer Agreements.

A repudiation occurs when a party to a contract makes "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance."  Uniform Commercial Code § 2-610 cmt. 1 (1989).  "[T]o constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not perform."  *Scott v. Majors*, 980 P.2d 214, 218 (Utah Ct. App. 1999) (quotation marks and alterations omitted).  *See also* Utah Code Ann. § 70A-2-610.  "Mere expression of doubt as to [a party's] willingness or ability to perform is not enough to constitute a repudiation."  Restatement (Second) of Contracts § 250 cmt. b (1979).  Anticipatory repudiation requires more than statements revealing a party does not want to perform the contract or has misgivings about the contract.  *Hurwitz v. David K. Richards & Co.*, 436 P.2d 794, 795-96 (Utah 1968).

-17-

Viewing Mr. Palmeri's voice message in the light most favorable to Lantec and Lantec Brazil, we conclude the message was not definite enough to serve as an anticipatory repudiation. The message only states two Novell executives *wanted* to terminate Novell's relationship with the Lantec companies. Nowhere in the message does it state Novell would not perform its duties under the Original Equipment Manufacturer Agreements.

B.    <u>Retraction</u>

Even if the voice mail message had been definite enough to act as a repudiation, the undisputed facts show Novell subsequently reaffirmed the Agreements. Utah law provides a repudiating party "can retract [its] repudiation unless the aggrieved party has since the repudiation canceled or materially changed [its] position or otherwise indicated that [it] considers the repudiation final." Utah Code Ann. § 70A-2-611(1). A party may retract "by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform." Utah Code Ann. § 70A-2-611(2).

After receiving the telephone message, Mr. Thoillier sent Novell a letter stating: "I am writing this letter to confirm your termination of the [Original

Equipment Manufacturer] Agreement[s]."[5]  Novell responded with a letter stating:

"I must take exception to [a] comment[] made in your letter. ....  [Y]ou referred to

Novell's 'termination' of the Lantec agreement[s].  [Those] agreement[s] can only

be terminated in writing and with appropriate notice."  On appeal, Lantec and

Lantec Brazil argue "the notion that Novell could not repudiate unless it

terminated the contract[s] in writing was simply nonsensical and poorly

reasoned."  Assuming termination did not need to be in writing, the letter

nevertheless shows Novell did not intend to terminate the Agreements.  Further

---

[5] The letter further states:  "I received notice of your termination by telephone message from Ron Palmeri last week."  In their reply brief, Lantec and Lantec Brazil argue this letter shows they treated the telephone call as a final repudiation.  They therefore argue Novell's "attempt to retract the repudiation came too late" under Utah Code § 70A-2-611.  We conclude Lantec and Lantec Brazil waived this argument.  In spite of the fact the district court's opinion concluded Novell retracted any repudiation, they did not raise their argument that Novell's retraction was ineffective in their initial appellate brief.  In fact, prior to the reply brief, the only time the Lantec companies raised this argument was in a motion for reconsideration before the district court.  The district court denied the motion for reconsideration because the argument "could have been, but was not, raised in the prior briefing and is therefore inappropriate in a motion to reconsider."  Similarly, the Lantec companies' argument has been brought to our attention too late.  "We are not obligated to address an argument which was not [properly] made in the district court, nor even in this court until the reply brief." *Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 887 (10th Cir. 1991). *See also Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (explaining arguments initially raised in a reply brief "rob[] the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent").  Thus, we decline to consider this argument.

-19-

showing Novell's commitment to the Agreements, the letter established a meeting between Novell and the Lantec companies on May 4, 1994, in Las Vegas. In closing, the letter reaffirmed, "Novell is willing to consider any reasonable proposal with respect to the ... [a]greement[s] to make th[ose] agreement[s] workable for Lantec (e.g., mutual termination of the agreement[s], restructuring of payment terms, reduction of volume commitment, etc.). I think you will find Novell to be very accommodating on this issue."

Novell's actions following the reaffirming letter also demonstrate a commitment to the Original Equipment Manufacturer Agreements. In May 1994, the parties met in Las Vegas to discuss the Agreements. The undisputed outcome of the meeting was that "[t]he parties did not reach any agreement as to their respective rights and duties under the Lantec [Original Equipment Manufacturer] [A]greement[s]," but that the Lantec companies would "evaluate their business relationship with Novell."

Consequently, we conclude the undisputed material evidence shows Novell successfully retracted any repudiation of the Original Equipment Manufacturer Agreements.

C.    Alleged Threat

In their appellate brief, Lantec and Lantec Brazil argue a threat made by Tom Pesut immediately following the Las Vegas meeting "raised a clear disputed fact about Novell's intention to repudiate the [Original Equipment Manufacturer] Agreement[s]." According to a portion of an affidavit submitted by Marcello Thoillier, Mr. Pesut, a Novell executive, said if the Lantec companies opposed the Novell/WordPerfect merger "Novell would immediately sever its relationship with these companies and put them out of business." Lantec and Lantec Brazil argue the alleged threat "belied the notion that Novell intended to continue doing business with Lantec."

The district court did not consider whether the alleged threat created a material issue of fact. Instead, the district court struck the portion of Mr. Thoillier's affidavit pertaining to the threat because the court found it was an attempt to create a "sham issue of fact." The court noted "Mr. Thoillier was extensively deposed over a period of several days on the same subject matters which form the bases for his affidavit." The court determined the relevant allegation "conflicts with Mr. Thoillier's prior deposition testimony regarding the meeting."

We review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion. *Sports Racing Servs., Inc. v. Sports Car Club*, 131 F.3d 874, 894 (10th Cir. 1997). Under this standard we will not disturb the district court's decision "unless [we have] a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Ortiz,* 804 F.2d 1161, 1164 n.2 (10th Cir. 1986.)

> There is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements. In assessing conflict under there circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.

*Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (citations omitted). In deciding whether an affidavit is an attempt to create a sham issue of fact, the relevant factors are "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id*.

Lantec and Lantec Brazil argue affidavit references to the alleged threat did not directly contradict Mr. Thoillier's deposition testimony. According to their

argument, counsel for Novell never asked Mr. Thoillier about his meeting with Mr. Pesut. Instead, Mr. Thoillier's deposition testimony only concerned the May 1994 meeting in Las Vegas with Novell officials and counsel for the Lantec companies and Novell. According to the affidavit, Mr. Pesut's threat came not in the scheduled meeting, but in a private conversation immediately following the meeting.

After reviewing the deposition and affidavit, we conclude the district court did not abuse its discretion in ruling parts of the affidavit contradicted Mr. Thoillier's deposition testimony. During the deposition Mr. Thoillier was specifically asked whether Mr Pesut was "receptive to a discussion" about continuing Novell's association with the Lantec companies. Mr. Thoillier answered he did not "recall these exact words." Counsel for Novell then asked whether "Novell had communicated that as far as it was concerned, it was prepared to go ahead with the [Original Equipment Manufacturer Agreements]." Mr. Thoillier said it "was discussed." Searching for further clarification, counsel for Novell asked to identify the result of the meeting. Mr. Thoillier admitted Lantec and Lantec Brazil were supposed to decide whether they wanted to modify their agreements with Novell and then schedule another meeting with Novell. Nothing in the deposition questioning suggested Mr. Thoillier should limit his

answers to discussions occurring when all of the people attending the meeting were present. During his deposition, Mr. Thoillier never mentioned any threats from Mr. Pesut. Consequently, the district court did not abuse its discretion in concluding the portions of the affidavit related to the alleged threat were contradictory.

Lantec and Lantec Brazil also argue the relevant portion of the affidavit was not "intended to create a sham issue of fact." They point to the deposition testimony of LanCompany's Chief Financial Officer, Ovidio Rovell, who testified Mr. Thoillier told him of Mr. Pesut's alleged threat. Novell conducted Mr. Rovell's deposition before Mr. Thoillier's. Because Mr. Rovell's testimony of Mr. Thoillier's hearsay statements gave Novell prior notice of the alleged threat, Lantec and Lantec Brazil argue the affidavit cannot be viewed as an attempt "to fabricate a disputed factual issue."

While it is true Novell had notice of the alleged threat, we cannot conclude the district court abused its discretion when other factors suggest the affidavit was intended to create a sham issue of fact. First, Mr. Thoillier was represented by counsel and cross-examined during his deposition. *See Franks*, 796 F.2d at 1237. Second, because the alleged threat is not newly discovered evidence, there

is no question Mr. Thoillier should have known about the alleged threat at the time of the deposition. *See id.* Third, there is nothing in the deposition testimony reflecting any level of confusion or uncertainty concerning Mr. Thoillier's testimony requiring clarification or explanation. *See id.* Given these circumstances, we do not have a definite and firm conviction the district court exceeded the bounds of permissible choice in striking the portions of Mr. Thoillier's affidavit related to the alleged threat. Consequently, we will not consider whether the alleged threat would have raised a material issue of fact.

In short, we conclude Novell was entitled to summary judgment on the claims involving the Original Equipment Manufacturer Agreements. Mr. Palmeri's telephone message was not definite enough to amount to a repudiation of the Agreements. Even assuming otherwise, the record shows Novell subsequently sent a letter reaffirming the Agreements and acted in accordance with the reaffirmation at a subsequent meeting. Aside from properly stricken portions of an affidavit, Lantec and Lantec Brazil have not directed us to any portion of the record suggesting otherwise. Therefore, we affirm the district court's grant of summary judgment on the breach of the Original Equipment Manufacturer Agreement claims.

III.    THE ALLEGED MESSAGE HANDLING SYSTEM ORAL AGREEMENT

Lantec and Lantec Brazil next argue Novell breached an oral agreement regarding Messaging Handling System. According to the verified complaint, Novell agreed to provide:

> (1) increased marketplace exposure; (2) approval and promotion of the manufacturer's messaging applications; (3) competitive advantages in the messaging applications marketplace because of association with NetWare; (4) opportunity for direct input to Novell concerning the growth and development direction of [Message Handling System]; (5) heavy support and promotion of [Message Handling System] as the dominant [Network Operating System] messaging [transport agent] and promotion of [Message Handling System] for many years to come; and (6) freedom from the fear or competition with the [network operating system] or messaging [transport agent] manufacturer – Novell.

In return, Lantec and Lantec Brazil contend they agreed to "(1) join in and actively (but not financially) support the [Message Handling System] Alliance; (2) convert existing products to [Message Handling System]; (3) migrate exclusively to the [Message Handling System] engine for development of future messaging applications; and (4) promote NetWare as the [Network Operating System] of choice for all messaging applications." They believe Novell broke these promises by merging with WordPerfect, manufacturing GroupWise, and failing to develop Message Handling System and Global Message Handling System after the merger.

The district court granted Novell's motion for summary judgment. The

-26-

court stated Lantec and Lantec Brazil "rely exclusively upon the allegations of their Verified Amended Complaint to show the existence and terms of the alleged [Message Handling System] oral agreement." The court concluded Lantec and Lantec Brazil had not produced specific evidence "to show the existence of the alleged oral [Message Handling System] Agreement."

Unsatisfied, Lantec and Lantec Brazil filed a motion for reconsideration arguing they should have been allowed to rely on their verified complaint at the summary judgment stage. In ruling on the motion, the court recognized that verified complaints can sometimes be used to avoid summary judgment. The district court, however, determined the relevant paragraphs of the complaint could not be treated as an affidavit because they did not relate to facts within Mr. Thoillier's personal knowledge. The court further stated "the factual allegations relied upon for this motion ... are conclusory .... For example, the [complaint] lack[s] specific details of who made the alleged promises on behalf of Novell." For these reasons, the district court also denied the motion for reconsideration.

On appeal, Lantec and Lantec Brazil argue the district court erred in refusing to consider the averments in their amended verified complaint as evidence of the contract. They believe the verified complaint shows genuine

issues of material fact precluding summary judgment.

"[W]e review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion." *Sports Racing Servs.*, 131 F.3d at 894. Under this standard, we will not disturb a district court's ruling "unless [we have] a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Ortiz, 804 F.2d at 1164 n.2.

A district court may treat a verified complaint "as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)." *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988). According to Rule 56(e), an affidavit must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Furthermore, a district court need not treat a verified complaint as an affidavit if "the allegations contained in the pleading are merely conclusory." *Conaway*, 853 F.2d at 793. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671-72 (10th Cir. 1998) ("The conclusory allegation in Plaintiff's complaint, although verified, are of ... little help in carrying her burden under Rule 56(e).");

*Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991) (holding a trial court must disregard conclusory allegations in a verified complaint when considering a motion for summary judgment).

We conclude the district court did not abuse its discretion in refusing to consider the amended verified complaint as an affidavit for summary judgment purposes. We agree the allegations in the complaint were conclusory and the district court was, therefore, free to disregard these allegations. This case is similar to *Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999), where we stated an affidavit was "conclusory, vague, and/or lacking in foundation" and was insufficient to support the conclusion an agreement had been formed. *Id*. at 855 n.9. In *Mitchael*, the affiant "fail[ed] to state how he learned of [the] agreement, who exactly represented the other ... companies, how he could speak for what they wanted or needed, when this agreement or understanding was formed, and how it was to operate." *Id*. Here, Mr. Thoillier's averments in the complaint do not reveal who represented Novell in making the oral contract. He did not state where or how the agreement was communicated and explains only that the agreement was reached "in approximately June 1993." With respect to the formation of the alleged Message Handling System oral contract, the amended verified complaint did little more than state a legal conclusion as to the terms of

the contract. Thus, we hold the district court was within the bounds of permissible choice in concluding the verified complaint was conclusory and refusing to consider the complaint as an affidavit.

Lantec and Lantec Brazil do not direct us to portions of the record, other than their verified complaint, to support the alleged breach of the Message Handling System oral contract. This is so even though Mr. Thoillier provided an extensive deposition and a supplemental affidavit. Because Lantec and Lantec Brazil have not provided record citations, we need not sift through the record in an attempt to find evidence of the alleged oral contract. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995). For these reasons, the breach of the Message Handling System oral contract claim fails.

IV.   PROMISSORY ESTOPPEL

The Lantec companies next appeal the district court's grant of summary judgment on their promissory estoppel claim. They argue, under the doctrine of promissory estoppel, Novell should be held to its promises: "(1) Novell would never compete in the applications market; (2) developers who agreed to work with Novell would be given access to technical information necessary to write applications for NetWare; and (3) those developers would profit by designing

applications solely for NetWare."The Lantec companies allege they relied on these promises to their detriment and should therefore be compensated.

The district court held Novell was entitled to summary judgment because the Lantec companies had not presented any evidence to support their contention Novell made enforceable promises to the Lantec companies. It pointed out "Mr. Thoillier ... candidly admits he can't recall <u>any</u> occasion when a representative of Novell ever said that Novell would 'never, ever' enter the applications business. As to the other alleged promises, plaintiffs have pointed to no evidence of such promises other than the allegations in their Amended Verified Complaint." Thus, the district court concluded, "[t]his is [a] case where plaintiffs rely on their subjective understanding of alleged vague and nonspecific conversations with Novell representations. This is not sufficient to support a promissory estoppel claim."

The Lantec companies first argue the district court "improperly disregarded the Amended Verified Complaint in reaching its determination." In our prior discussion of the alleged Message Handling System oral contract, we rejected the argument that the district court acted inappropriately in refusing to consider portions of the amended verified complaint relevant to the oral contract claim.

Here, we conclude the portion of the complaint related to the promissory estoppel claim is similarly conclusory. The complaint does not reveal which of Novell's officers or employees made the alleged promises nor does it reveal when, where, or how the promises were communicated. Instead the complaint merely recites the alleged promises and concludes Novell "made the representations and promises ... with the knowledge and intention that Lantec and Lantec Brazil would detrimentally rely on such representations and promises."The district court did not abuse its discretion in refusing to consider these conclusory allegations as an affidavit. *See Conaway*, 853 F.2d at 792-93.

The Lantec companies have not directed us to any portion of the record, other than their complaint, to support their claim Novell promised to give developers technical information. Likewise, they have not provided citations to the record to support their claim Novell promised developers would profit by designing applications solely for NetWare. Because these alleged promises have no support in the record, the district court properly dismissed them.

The Lantec companies have, however, directed us to portions of the record to support their claim Novell promised to never enter the applications business. Therefore, we must decide whether this evidence supports a promissory estoppel

claim. We conclude it does not.

Under Utah law, the elements of promissory estoppel are:

> (1) The promisee acted with prudence and in reasonable reliance on a promise made by the promisor; (2) the promisor knew that the promisee had relied on the promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person; (3) the promisor was aware of all material facts; and (4) the promisee relied on the promise and the reliance resulted in a loss to the promisee.

*J.R. Simplot Co. v. Sales King Int'l, Inc.*, 17 P.3d 1100, 1107 (Utah 2000) (quotation marks and alterations omitted). "[T]he alleged promise must be reasonably certain and definite, and a claimant's subjective understanding of the promissor's statements cannot, without more, support a promissory estoppel claim." *Nunley v. Westates Casing Servs., Inc.*, 989 P.2d 1077, 1089 (Utah 1999). *See also J.R. Simplot*, 17 P.3d at 1107.

The Lantec companies argue the district court "improperly disregarded" deposition testimony from Mr. Thoillier, deposition testimony from two independent software developers, and internal Novell documents. We will begin our analysis with Mr. Thoillier's testimony. The Lantec companies direct us to a portion of Mr. Thoillier's deposition. It states:

> Q: The allegation is made Novell promised developers, including Lantec and Lantec Brazil, that Novell was only in the

business of marketing, distributing NetWare and would never compete with such developers in the NetWare applications market. Were you ever present when such representations were made?

A: Yes

Mr. Thoillier continued, saying Novell employees Jared Blauser, Roy Olsen, and Ray Noorda all made such promises.

But this is not the end of Mr. Thoillier's testimony. Upon further questioning, Mr. Thoillier retreats from the position he heard specific promises Novell would not enter the applications business. When asked specifically what Novell said, Mr. Thoillier answered:

It was the same speech. We are in the application business. We are not in the – I'm sorry, we are in the operating systems business. We are not in the application business blah-blah-blah. We are – in fact, the whole industry talks about Novell being the Switzerland of the software. That's why Novell partnered with so much [sic]. That's why you have so may application vendors that began to develop for Novell networks.

While this statement supports the proposition Novell was not then in the applications business, it does not show a certain and definite promise not to enter the applications business. In fact, Mr. Thoillier eventually admitted he could not recall an instance where Novell promised it would never enter the applications business.

Q: ... Do you recall any occasion when any Novell officer or director or employee in your presence said under no circumstances,

-34-

or words to that effect, will Novell get in the quote-unquote "applications" business?

A: I don't recall. I just recall until such a time as the merger happened the speech was the same. Novell was not going to enter into the application business until the time the merger happened. And then everyone was, even the Novell employees ... were all speechless.

Q: But you do not recall an occasion where Novell said – when anyone associated with Novell ever said Novell, under no circumstances, will ever get into the applications business; isn't that true?

A: No. I don't recall.

Mr. Thoillier's testimony established only that Novell had stated it was not in the applications business. This is not a clear and definite promise. Furthermore, to the extent Mr. Thoillier's deposition claims a promise, it is only his subjective understanding of Novell's statements that is insufficient to support the claim Novell promised it would not enter the applications business.

In addition to Mr. Thoillier's testimony, other Lantec employees testified they could not recall any instance where Novell clearly stated it would never enter the applications business. The Lantec companies never produced an employee or officer of any kind who heard Novell make a clear or definite promise Novell would not enter the applications business. We cannot see how, as a matter of law, the Lantec companies could reasonably rely on a promise when nobody at the

-35-

Lantec companies can recall Novell specifically making that promise.

Nevertheless, we turn to other evidence offered by the Lantec companies. They direct us to the testimony of two independent software developers who were making applications for use with Message Handling System. One developer testified Novell repeatedly said it was not in the applications business. "[T]he phrase that I kept hearing from Novell people was that we are not in the application – we don't develop applications. We develop the network operating system or as they call it, the plumbing." Again, this testimony, at most, establishes the fact Novell was not initially in the applications business, but does not show Novell promised it would never enter the applications business. Other similar testimony is, likewise, unhelpful to the Lantec companies' argument.

Finally, the Lantec companies direct us to internal Novell documents written by Jeff Callo, a Novell employee. Novell argues "these documents were not part of the record below when the district court granted summary judgment and Lantec cannot rely upon them now." The Lantec companies do not respond to this argument in their reply brief. After reviewing the copies of the summary judgment motion and response provided as part of the record on review, it appears these documents, while referenced in the Lantec companies brief, were not

presented to the district court. Our examination on review "is confined to an examination of materials before the lower court at the time the ruling was made." *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1475 (10th Cir. 1993) (quotation marks and alterations omitted). We "will not reverse the grant of summary judgment based on evidence not before the district [court]." *Id.* (quotation marks and alterations omitted). Consequently, we will not consider the documents written by Mr. Callo.

In sum, we affirm the grant of summary judgment on the promissory estoppel claim. The Lantec companies are not entitled to rely on their conclusory verified complaint. They have offered no additional evidence on their claim Novell promised it would provide technical information or their claim Novell promised the Lantec companies would profit by developing Message Handling System applications. In addition, the Lantec companies failed to produce any evidence of a clear and definite promise Novell would never enter the applications business. Further, the Lantec companies' reliance on any promise was unreasonable when they could not produce a single officer or employee who remembered hearing the promise.

## ANTITRUST CLAIMS

Having resolved the contract and promissory estoppel claims, we turn to the

antitrust claims. In their complaint, the Lantec companies alleged: (1) the Novell/WordPerfect merger was an unlawful vertical[6] merger because it lessened competition in the "groupware for NetWare" market in violation of 15 U.S.C. § 18;[7] (2) Novell contracted, combined, and conspired to unreasonably restrain trade and commerce in violation of 15 U.S.C. § 1; (3) Novell monopolized, attempted to monopolize, and conspired with WordPerfect to monopolize the groupware for NetWare market in violation of 15 U.S.C. § 2; and (4) Novell unlawfully used its monopoly power in the network operating system market as leverage to gain a competitive advantage in the groupware for NetWare market in violation of 15 U.S.C. § 2.[8] The Lantec companies also brought identical claims

---

[6] "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition.'" *Id*. at 323-24 (citation omitted).

[7] The Lantec companies originally alleged unlawful competition in the "NetWare Messaging Applications Market." Later, the Lantec companies refined their description to the "groupware for NetWare market." Following the parties and the district court we use the latter term. *Lantec*, 146 F. Supp. 2d at 1144 n.1.

[8] The Lantec companies also brought a claim alleging Novell unlawfully tied its groupware product to NetWare thereby lessening competition in the groupware for NetWare market in violation of 15 U.S.C. § 14. The district court dismissed this claim, *Lantec*, 146 F. Supp. 2d at 1155, and Lantec and Lantec Brazil have not appealed the dismissal.

under Utah antitrust statutes.  *See* Utah Code Ann. § 76-10-914(1), (2).[9]

Prior to trial, the district court granted Novell's motion to dismiss the antitrust claims brought by LanCompany and LanTraining finding the court lacked subject matter jurisdiction.  Neither LanCompany or LanTraining appealed this ruling.

The case proceeded to trial on the antitrust claims brought by Lantec and Lantec Brazil.  After Lantec and Lantec Brazil presented their case, Novell moved for judgment as a matter of law.  *Lantec*, 146 F. Supp. 2d at 1142.  The district court granted the motion concluding the antitrust claims should fail because (1) Lantec and Lantec Brazil failed to establish the existence of the alleged groupware for NetWare market; (2) Lantec and Lantec Brazil failed to produce evidence of any conspiracy between Novell and WordPerfect; and (3) Lantec and Lantec Brazil failed to produce evidence of antitrust injury.  *Id*. at 1156.  In their appeal, Lantec and Lantec Brazil challenge each of these conclusions.

---

[9] The parties agree the Utah antitrust claims are duplicative of the federal antitrust claims.  We, therefore, will not address the Utah antitrust claims separately.

We review the district court's grant of judgment as a matter of law *de novo*, using the same standard as the district court. *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999). According to the Federal Rules of Civil Procedure, "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court ... may grant a motion for judgment as a matter of law against that party." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Baty*, 172 F.3d at 1241 (quotation marks and citation omitted). We must, however, affirm the grant of judgment as a matter of law in favor of Novell "if there is no legally sufficient evidentiary basis with respect to a claim ... under the controlling law." *Id*. (quotation marks and alterations omitted). With this standard in mind, we will examine each of the district court's conclusions.

I.    Relevant Market

Lantec and Lantec Brazil argue they produced evidence sufficient to establish a world-wide groupware for NetWare market. We disagree.

The relevant market is "a market relevant to the legal issue before the

court." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) (quotation marks and citation omitted). In order to prevail on all their antitrust claims, except the conspiracy to monopolize claim,[10] Lantec and Lantec Brazil must establish the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (holding "[d]etermination of the relevant market is a necessary predicate to a finding of" unlawful merger under 15 U.S.C. § 18); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) (holding a 15 U.S.C. § 1 unreasonable restraint of trade claim requires proof "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade *in the relevant market*" (emphasis added)); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (holding monopolization and attempted monopolization claims under 15 U.S.C. § 2 require

_____

[10] *See Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir. 1975) ("Specific intent to monopolize is the heart of a conspiracy [to monopolize] charge [under 15 U.S.C. §2], and a plaintiff is not required to prove what is the 'relevant market.'"). We note there is a split among the circuits as to whether proof of the relevant market is required to prove a conspiracy to monopolize claim. *Compare Salco*, 517 F.2d at 576 (holding proof of relevant market is not required) *with Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997); *Bill Beasley Farms, Inc. v. Hubbard Farms*, 695 F.2d 1341, 1343 (11th Cir. 1983) (holding proof of relevant market is required). In this case, Novell does not argue Lantec and Lantec Brazil should be required to establish the relevant market to succeed on the conspiracy to monopolize claim. Furthermore, we are bound by our precedent and therefore need not revisit this rule. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993).

proof of the relevant market); *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1349 (9th Cir. 1986) (holding leveraging claims under 15 U.S.C. § 2 require proof of the relevant primary and secondary markets).[11]

In this case, Lantec and Lantec Brazil bear the burden of defining the relevant market. *See Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991). The relevant market is made up of the product at issue and available substitutes for that product. *See Visa USA*, 36 F.3d at 966. "In defining the relevant market, two aspects must be considered: the product market and the geographic market." *Rural Tel. Serv., Co. v. Feist Publ'ns, Inc.*, 957 F.2d 765, 768 n.2 (10th Cir. 1992). In this case, we divide our discussion of Lantec and Lantec Brazil's evidence of a worldwide groupware for NetWare market first into expert testimony and then into lay testimony.

---

[11] There is a circuit split as to whether leveraging is an independent claim under 15 U.S.C. § 2. *See Eleven Line, Inc. v. North Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 n.16 (5th Cir. 2000) (recognizing circuit split). We have not yet decided whether leveraging is an independent claim in the Tenth Circuit and need not reach the issue in this case. Even assuming the existence of an independent § 2 leveraging cause of action, Lantec and Lantec Brazil's leveraging claim fails because they have not established the relevant market.

A.    Expert Testimony

Lantec and Lantec Brazil argue the testimony of their economic expert, Dr. John C. Beyer, is sufficient to establish the groupware for NetWare market.  Dr. Beyer testified the relevant market was "groupware for NetWare users."  After hearing Dr. Beyer's testimony at trial, the district court found the testimony lacked foundation, was unreliable, and should be excluded in its entirety.  The district court concluded "Dr. Beyer did not employ in the courtroom the same level of intellectual rigor that characterizes an expert in the field of economics and industrial organization."  Specifically, the court stated Dr. Beyer (1) used unreliable data; (2) did not understand computers or the computer market; (3) testified the relevant market was determined by consumer purchasing patterns but did not conduct or cite surveys revealing consumer preferences; (4) did not calculate the cross-elasticity of demand to determine which products were substitutes; (5) changed his opinion from the opinion he gave in an earlier expert report; and (6) did not address changes in the computer market.  Further, the district court found portions of Dr. Beyer's testimony were non-technical in nature and would not assist the jury.  We agree with the district court's assessment.

Federal Rule of Evidence 702 governs the admissibility of expert witness

testimony. Fed. R. Evid. 702. Under Rule 702, expert testimony is admissible if it will assist the trier of fact and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-95 (1993), outlines the framework a district court should use in determining whether to admit evidence under Rule 702.

> Under *Daubert*, courts measure reliability of scientific evidence by considering (1) whether the technique can and has been tested; (2) whether the technique has been subjected to peer review; (3) the known or potential error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained general acceptance in the scientific community.

*United States v. Call*, 129 F.3d 1402, 1404 (10th Cir. 1997) (citing *Daubert*, 509 U.S. at 593-95), *cert. denied*, 524 U.S. 906 (1998). "We review *de novo* whether the district court properly followed the framework set forth in *Daubert*." *Id*. at 1405. If, however, the district court correctly applied the *Daubert* standards, we may reverse only if we find the district court abused its discretion. *Id*.

From its order, it is clear the district court followed the *Daubert* framework. Therefore, we look to see whether the district court abused its discretion in excluding Dr. Beyer's testimony. After reviewing Dr. Beyer's testimony, we conclude the district court order excluding the testimony is

-44-

thorough and well-reasoned. We see little benefit in reproducing the reasoning from the district court's eighteen-page order.

We will, however, comment on one particularly troubling aspect of Dr. Beyer's testimony. Throughout his testimony, Dr. Beyer relied heavily on his personal experience as president of a consulting firm which installed a new network operating system. Before Lantec and Lantec Brazil hired Dr. Beyer as an economic expert, his consulting firm was looking for a new network operating system. In an effort to make an informed purchase, Dr. Beyer spoke with the technology experts at two or three other consulting firms in the Washington, D.C. area. Lantec and Lantec Brazil characterize Dr. Beyer's limited personal experience as reliable and scientific "first-hand interviews." In reality, Dr. Beyer attempted to spin anecdotes from a handful of personal conversations with firms in a limited geographic area into evidence of a worldwide product market. These conversations are not sufficient facts or data to support Dr. Beyer's conclusions. The district court did not abuse its discretion in excluding Dr. Beyer's testimony.

B.     Lay Testimony

Lantec and Lantec Brazil argue "[e]ven without Dr. Beyer's testimony, there was more than sufficient evidence for the jury to find the existence of the

groupware for NetWare market."

The district court held Lantec and Lantec Brazil had not produced sufficient lay testimony or other evidence to establish a relevant market. *Lantec*, 146 F. Supp. 2d at 1149. It concluded Lantec and Lantec Brazil had not presented evidence to support the groupware for NetWare product market because they did not present "evidence on the costs of the various products or of how the consumer would react to a price increase in such costs, there is no evidence of price sensitivity. There is no evidence of consumer preferences." *Id*. at 1148-49. The district court also held the "skimpy evidence of [Lantec and Lantec Brazil's] own experiences" was not sufficient to support a world-wide geographic market. *Id*. at 1149.

In their opening brief, Lantec and Lantec Brazil argue the district court impermissibly "weighed evidence and made credibility determinations in holding as a matter of law that Lantec failed to establish the existence of the groupware for NetWare market." Lantec and Lantec Brazil point to Novell documents stating Novell's belief customers wanted groupware tightly integrated with NetWare. They further claim "Lantec's ... marketing firm ... recognized the existence of the groupware for NetWare market ... [and] advised Lantec to focus

on the submarket of groupware made for NetWare."

While Lantec and Lantec Brazil offered lengthy arguments as to how the record supports their definition of the product market, their opening brief did not challenge the district court's conclusion that they had not proven a geographic market. Novell responded to Lantec and Lantec Brazil's opening brief by arguing Lantec and Lantec Brazil had waived any appeal of the district court's ruling on the geographic market. Only then, in their reply brief, did Lantec and Lantec Brazil argue "the worldwide geographic market was established."

We are under no obligation to address the district court's geographic market ruling because Lantec and Lantec Brazil did not raise the issue in their opening brief. *See Stump*, 211 F.3d at 533. Since proof of relevant market requires evidence of both a product market and a geographic market, *Feist*, 957 F.2d at 768 n.2, we can affirm the district court's decision simply because Lantec and Lantec Brazil failed to properly appeal the geographic market ruling.

Even if Lantec and Lantec Brazil had properly raised their argument against district court's ruling on the geographic market, their definition of a "worldwide geographic market" fails. "The geographic market consists of the area of effective

competition." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 893 (10th Cir. 1991). It is "the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986) (quotation marks and alterations omitted), *cert. denied*, 486 U.S. 1005 (1988). The size of the relevant geographic market depends on a number of factors, including "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991). *See also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979).

Lantec and Lantec Brazil have not pointed us to any facts in the approximately 10,000 pages of record that specifically address price data, the location and facilities of other producers, or any of the other factors cited by courts as relevant to determining the relevant geographic market. Instead, Lantec and Lantec Brazil claim they presented evidence sufficient to establish a worldwide geographic market because "Lantec established that it sold XPost, its first groupware product, around the world."They also state they "established that [Lantec] intended to sell XPostWare around the globe as evidenced by the

numerous domestic and foreign distribution contracts it negotiated."

Neither of Lantec and Lantec Brazil's arguments is effective. First, under Lantec's definition of groupware (products containing e-mail and one other messaging application), XPost is not groupware. XPost consisted solely of an e-mail application. Consequently, sale of XPost in several different international markets cannot establish a worldwide groupware market.[12] Second, the fact Lantec and Lantec Brazil were, through distributorship agreements, attempting to sell their products in several different countries is not, by itself, helpful. "[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3rd Cir. 1992). *See also Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (holding where the plaintiff company

---

[12] The distinction between groupware and Lantec's XPost e-mail application is not merely semantic. Had Lantec and Lantec Brazil's antitrust claims survived judgment as a matter of law, they would have had a tactical advantage in narrowly defining the "groupware for NetWare" market to exclude competitors whose applications only contained an e-mail program. Since Lantec and Lantec Brazil narrowly define the relevant product market in order to bolster their product market and monopoly power arguments, Lantec and Lantec Brazil must, at a minimum, live with this narrow definition in establishing the relevant geographic market.

competes does not define the relevant geographic market).

Because Lantec and Lantec Brazil have not properly appealed the district court's determination of the geographic market and, in any event, did not introduce evidence from which a jury could find a worldwide market, we need not consider whether they introduced evidence sufficient to establish a groupware for NetWare product market. We, therefore, affirm the district court's grant of judgment as a matter of law on the unlawful vertical merger claim, conspiracy to restrain trade claim, monopolization claim, attempted monopolization claim, and leveraging claim.

II.    Conspiracy

Having affirmed the dismissal of the other antitrust claims, we must now consider whether Lantec and Lantec Brazil have established their conspiracy to monopolize claim brought under 15 U.S.C. § 2. According to Tenth Circuit case law, a conspiracy to monopolize claim requires proof of "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize." *TV Communications Network*, 964 F.2d at 1026 (quotation marks and citation

omitted).

The district court granted judgment as a matter of law on the conspiracy to monopolize claim, concluding Lantec and Lantec Brazil had not produced sufficient evidence for a jury to find a conspiracy between Novell and WordPerfect prior to the merger. The court stated: "[I]f this case the evidence produced by Plaintiffs at trial is that WordPerfect and Novell representatives met in the period between merger announcement and completion. Among other things they discussed were [Message Handling System] and integration. Some persons in the two companies were in favor of [Message Handling System] and some were not." Rather than suggesting a common scheme, the court concluded the evidence "shows the opposite, that the companies had different views on how things should proceed." Consequently, the court held "Plaintiffs' evidence is mere speculation and conjecture, and that will not suffice." Lantec and Lantec Brazil have appealed the district court's conclusion there was no evidence of a conspiracy.

In considering whether Lantec and Lantec Brazil have produced evidence of a conspiracy, we are guided by relevant case law. Initially, a conspiracy requires at least two parties. A corporation is not capable of conspiring with itself. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-72

(1984). A plaintiff can prove a conspiracy with either direct or circumstantial evidence. *See American Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946) ("The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in any exchange of words."). When a plaintiff attempts to prove conspiracy through circumstantial evidence, "ambiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1556 (10th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)), *cert. denied*, 516 U.S. 1044 (1996).[13] "A plaintiff must offer evidence tending to exclude the possibility that the alleged conspirators either acted independently or colluded in a way that could not have harmed the plaintiff." *Id.*

_____

[13] In describing the necessary evidence to infer a conspiracy, both *Multistate Legal Studies* and *Matsushita* are specifically addressing a conspiracy to restrain trade under 15 U.S.C. § 1 rather than a conspiracy to monopolize under 15 U.S.C. § 2. However, the limits on inferences of concerted actions under § 1 apply in § 2 cases. *See AD/SAT v. Associated Press*, 181 F.3d 216, 232-33 (2d Cir. 1999); *In re Beef Indus. Antitrust Litig.,* 907 F.2d 510, 516 (5th Cir. 1990); *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 996 (4th Cir. 1990). *But see H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1019 & n.9 (2d Cir. 1989) (raising the possibility inferential restraints under § 1 do not apply to § 2).

A. Pre-Merger Conduct

In arguing for an inference of a pre-merger conspiracy, Lantec and Lantec Brazil first direct us to several actions Novell took after merging with WordPerfect. They claim: (1) "Novell created incompatibility with [Message Handling System] and [Global Message Handling System] *post-merger*"(emphasis added); (2) "Novell 'did not do a lick' to enhance [Message Handling System] *post-merger*" (emphasis added); (3) Novell "refus[ed] to provide the [application program interfaces] to GroupWise"; (4) "Novell refused to 'unbundle' the GroupWise [message transport agent] from the rest of the application"; (5) Novell prevented independent software programers "from using its trade dress *after the merger*" (emphasis added); and (6) "Novell abandoned all marketing activities on behalf of [independent software programers] *after the merger*" (emphasis added). Although Lantec and Lantec Brazil appear to acknowledge Novell and WordPerfect could not, as a matter of law, conspire after the merger, their theory is the post-merger actions raise an inference Novell and WordPerfect conspired before the merger.

In carefully reviewing the record, we could not find a shred of evidence suggesting Novell and WordPerfect agreed to any of these post-merger changes before the merger was complete. Novell's post-merger actions taken alone are

just "as consistent with permissible competition" agreed to after the merger as they are "with [an] illegal conspiracy" agreed to before the merger. *See Multistate Legal Studies*, 63 F.3d at 1556. Therefore, in this instance, Novell's post-merger actions are not sufficient to raise an inference of conspiracy to monopolize. *See id.*

Lantec and Lantec Brazil next argue Novell's "termination of the [Original Equipment Manufacturer] Agreement[s] point[s] to a conspiracy." This argument fails because we have already concluded Novell did not terminate the Agreements.

B.    GroupWise Application Program Interfaces

Lantec and Lantec Brazil continue their attempt to show a conspiracy by stating "the evidence established that the GroupWise developers within WordPerfect received pre-release [NetWare application program interfaces] prior to consummation of the merger, thus establishing, if not at least raising an inference of, an agreement to monopolize." According to Lantec and Lantec Brazil, a GroupWise "version was released in October of 1994, at approximately the same time as NetWare 4.1, yet was totally integrated with NetWare 4.1. These circumstances strongly indicate that the GroupWise developers received

pre-release [application program interfaces] before consummation of the merger."

After reviewing the record, we conclude it lacks any evidence showing GroupWise developers were given pre-release NetWare application program interfaces. Lantec and Lantec Brazil's assertions rest on the testimony of their witness Antonio Sergio Martins. Mr. Martins' testimony is speculative and does not lead to the conclusion Novell and WordPerfect conspired. Mr. Martins testified:

> I am speaking theoretically, hypothetically. If GroupWise went out on the market a few weeks after NetWare came out already prepared as a ready product, a product that was edited, documented, already produced for computers, it is very probable that the GroupWise team, the group which was developing the software, would have had access to that quite a bit before, previously. A few weeks before. I am speaking hypothetically just based on my experience.

When asked whether he had "any specific knowledge as to whether or not GroupWise developers actually received or actually wrote any GroupWise product to any unpublished [application program interfaces]," Mr. Martins said he could not "say anything about that except hypothetically." Mr. Martins went on to admit the application program interfaces from a previous version of NetWare were publically released and could have been used to write the 1994 GroupWise program. Other portions of the record uniformly state the GroupWise version released in 1994 was written with the public application program interfaces from

a prior version of NetWare. Consequently, the record does not support the conclusion Novell conspired with WordPerfect by giving WordPerfect pre-release NetWare application program interfaces.

### C. Business Justification

Lastly, Lantec and Lantec Brazil claim there is evidence showing prior to the merger Novell and WordPerfect intended to shift all of the Message Handling System customers to GroupWise. They argue this is sufficient evidence to support the inference Novell and WordPerfect conspired to monopolize. Novell denies "that Novell and WordPerfect took any actions to migrate [Message Handling System users] to GroupWise" during the time when a conspiracy could have been formed. Novell further argues its shift from Message Handling System to GroupWise was "fully justified by its efforts to compete with Microsoft and Lotus in a market that was ever changing, rapidly evolving, fiercely competitive, and technologically complex." In response, Lantec and Lantec Brazil claim there is no evidence in the record showing "Novell had a plausible business justification to take these actions."

After careful consideration of the record, we conclude any agreement between Novell and WordPerfect to move from Message Handling System to

GroupWise had legitimate business justifications. Uncontested evidence shows the groupware, messaging engine, and e-mail markets were in flux. Novell's key rivals, Microsoft and Lotus, were developing completely new groupware products to compete with Message Handling System, as well as with other groupware and e-mail applications. Eventually, Microsoft, Lotus, and other developers began giving e-mail applications away for free. Novell could not expect independent developers to be interested in developing products other companies were giving away. In this rapidly changing environment, there were obvious pro-competitive justification for Novell to develop a new messaging engine and complimentary groupware software. Because conduct as consistent with permissible competition as with illegal conspiracy does not support an inference of antitrust conspiracy, *Matsushita Electric Indus.*, 475 U.S. at 588, any shift from Message Handling System to GroupWise does not support the inference Novell and WordPerfect conspired to monopolize.

In sum, we conclude Lantec and Lantec Brazil have not produced evidence from which a jury could draw an inference of a conspiracy to monopolize. Therefore, their conspiracy to monopolize claim under 15 U.S.C. § 2 fails.

III.    ANTITRUST INJURY

Because we have affirmed the district court's decisions that Lantec and

Lantec Brazil failed to prove the relevant market and failed to prove a conspiracy,

there are no antitrust claims remaining. We, therefore, decline to address whether

Lantec and Lantec Brazil provided proof of an antitrust injury.


**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's decision.[14]

---

[14] In its brief, Novell urges us to sanction the Lantec companies for inaccurate and misleading record citations. We may impose sanctions if we determine an appeal is frivolous. Fed. R. App. P. 38. While an appeal may be frivolous if it consists "of irrelevant and illogical arguments based on factual misrepresentations and false premises," *Romala Corp. v. United States*, 927 F.2d 1219, 1222 (Fed. Cir. 1991), the Lantec companies' misstatements are not egregious enough to warrant sanctions in this case.