Caroline **BEHREND**, et al.

v.

**COMCAST CORPORATION**, et al.

**Civil Action No. 03–6604.**

United States District Court, E.D. Pennsylvania.

May 2, 2007.

Daniel H. Charest, Jason P. Fulton, Susman Godfrey LLP, Dallas, TX, Jayne A. Goldstein, Carol A. Mager, Mager & Goldstein LLP, Philadelphia, PA, Jessica N. Servais, David R. Woodward, Heins Mills & Olson PLC, Minneapolis, MN, Gary L. Specks, Kaplan Fox & Kilsheimer LLP, Highland Park, IL, for Plaintiffs.

Darryl J. May, Jason A. Leckerman, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, James T. Cain, Melonie S. Jurgens, Michael S. Shuster, Sheron Korpus, Kasowitz Benson Torres & Friedman LLP, New York, NY, for Defendants.

## *MEMORANDUM*

PADOVA, District Judge.

### I. INTRODUCTION

Plaintiffs, six non-basic cable television programming services customers of Defendants in the Philadelphia, Pennsylvania and Chicago, Illinois regions, have brought this antitrust suit on behalf of themselves and all those similarly situated, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for violations of Sections 1 (Count I) and 2 (Counts II and III) of the Sherman Act, 15 U.S.C. §§ 1, 2. The Third Amended Complaint (the "Complaint") alleges that Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively "Comcast") acquired cable systems and cable subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced. (Complaint ¶¶ 3, 49, 51–53.) Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (*Id.* ¶ 4.) (The challenged acquisitions and swap agreements are collectively "the Cable System Transactions.") The alleged result of the swap agreements was that Comcast willfully obtained and maintained monopoly power in the relevant geographic markets, defined as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (*Id.* ¶¶ 6,

31.) The Complaint also contains allegations that Comcast further violated § 2 by engaging in conduct excluding and preventing competition, including competition from an overbuilder, RCN Telecom Services, Inc. ("RCN") (Complaint ¶¶ 86–97.)[1]

Plaintiffs seek to represent a class consisting of all cable television customers who subscribed at any time since December 1, 1999, to video programming services other than just basic cable ("Expanded Basic cable") from Comcast in the so-called Philadelphia cluster, excluding government entities, Defendants and Defendants' subsidiaries and affiliates, and the Court. (Compl. ¶ 31.b(1).)[2]

## II. CLASS CERTIFICATION

### A. *Burden of Proof*

A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23. *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183–84 (3d Cir.2001). To meet this burden, Plaintiffs must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the subsections of Rule 23(b). *Id.; see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The United States Court of Appeals for the Third Circuit has recognized the utility, and often the necessity, of looking beyond the pleadings at the class certification stage of the litigation. *See Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 259 F.3d 154, 168–69 (3d Cir.2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."). Despite that review, "it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage" and "the substantive allegations of the complaint must be taken as true." *Chiang v. Veneman*, 385

F.3d 256, 262 (3d Cir.2004). In addition, "the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir.1970) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir.1968)).

Plaintiffs have submitted their expert report, along with excerpts of the Plaintiffs' and the expert's depositions. Comcast has submitted its own expert report, along with attorney declarations, exhibits and deposition excerpts.

### B. *The Class Certification Record*

#### 1. Dr. John C. Beyer

Plaintiffs' expert, John C. Beyer, Ph.D., was retained to determine whether Comcast violated §§ 1 and 2 of the Sherman Act through the imposition of horizontal market restraints arising from the swapping of cable systems with actual and potential competitors, acquiring actual and potential competitors, and the alleged unlawful acquisition and maintenance of monopoly power by building clusters of cable systems in Philadelphia and Chicago. (*Id.* ¶ 4.) Beyer examined the economic characteristics of the market for subscription television programming. (*Id.* ¶ 6.) He makes the following conclusions based on that examination:

1. The product supplied is essentially the same for all Class members within each cluster area. They all purchased packaged cable television programming from Comcast, which included at least Comcast's "expanded basic" tier of television channels and which is fundamentally the same for all subscribers. (*Id.* ¶¶ 7a, 23–25.)

2. Comcast has market power in the Philadelphia and Chicago markets as a consequence of its building clusters of cable systems, which increased its monopoly power, and raised entry barri-

---

1. "Overbuilder" is the term given for a cable company engaged in the business of constructing cable infrastructure for the purpose of competing directly against other cable providers in the same franchise zone.

2. Plaintiffs also seek to certify a separate class of identically defined subscribers in the so-called Chicago cluster. (Compl. ¶ 31.b(2).) Certification of the Chicago cluster class is not presented in the current Motion.

ers for potential competitors (multiple cable system operators ("MSOs"), companies that previously competed in the markets but were removed and did not reenter, other cable companies and overbuilders). Comcast also has market power because it does not face sufficient competition to constrain prices[3] —competition from satellite providers and overbuilders being insufficient to constrain prices—and because purchasers of Comcast's services cannot avoid its exercise of market power, prices for its services are higher based on the alleged antitrust violations.[4] (*Id.* ¶¶ 7b, 26–32.)

3. Class members in each cluster are similarly impacted by Comcast's pricing decisions, with each class member paying the same price for Expanded Basic, that price becoming common under Comcast's ownership, and having increased as a consequence of Comcast's increased market power.[5] (*Id.* ¶¶ 7c, 23, 33–36.)

4. Price increases for Expanded Basic have been nearly the same across all systems in each cluster. (*Id.* ¶ 7d.)

5. Subscribers would benefit from effective competition in each market area, because it would result in lower prices. (*Id.* ¶ 7e.)

Beyer opines that there are accepted methodologies available to quantify damages related to the alleged antitrust violations. He has identified two benchmarks from pricing patterns of other cable systems to estimate the class-wide economic impact of Comcast's activities: the supra-competitive overcharge and the supra-competitive rate of price increase. (*Id.* ¶¶ 8, 40.) He opines that the supra-competitive overcharge is 15%, established by comparing the prices of systems

with overbuilder competition. He opines that the supra-competitive rate of price increase has been almost double for Comcast when compared to cable systems across the United States. (*Id.*)

Beyer states, "[f]or the purpose of this declaration I have assumed the facts and antitrust violations alleged in the Plaintiffs' Complaint did in fact occur." (*Id.*) In preparing his report, Beyer relied on a study by Dr. H.J. Singer,[6] as well as various governmental studies of the effects of cable system overbuilding. (*Id.* ¶ 28.)

### 2. Dr. Stanley Besen

Comcast submits the report of its expert, Dr. Stanley Besen. He opines that Beyer's analysis is both misleading and incomplete because: (1) his data does not support his proposition that prices and service offerings are "essentially" the same within the Philadelphia cluster; and (2) he fails to consider the chronology of the acquisitions, the start of digital cable offerings and the differences in geographic proximity of the acquiring and acquired systems. These factors, Besen asserts, lead to differences among the putative class members. (Def.'s Ex. D at ¶ 8.) Besen concludes that Beyer's analysis does not show that all members of the class have been similarly impacted by Comcast's behavior because:

1. The data suggests that significant numbers of subscribers were unaffected by the formulation of the Philadelphia cluster because they faced little or no possibility of overbuilding and the probability of overbuilding varied among subscribers. (*Id.* ¶ 8a.)

2. All subscribers did not receive the same channels, and have not paid the

---

3. According to Beyer, Comcast controls 87% of the market in the Philadelphia cluster and 61% in the Chicago cluster. (*Id.* ¶ 27.)

4. Beyer states that systems within clusters have prices 2.4% higher than non-cluster systems. When a system is affiliated with a MSO, prices are 13.7% higher. (*Id.* ¶ 29.) When there is competition from an overbuilder, prices are 15% lower. (*Id.* ¶ 30.)

5. Beyer opines that prices in the Philadelphia cluster have increased at an average annual rate of 10.8%, and in Chicago at 9.7%. The average for price increases for systems facing "effective competition" was only 5.8%. (*Id.* ¶ 36.)

6. H.J. Singer, "Does Clustering by Incumbent Cable MSOs Deter Entry by Overbuilders?," Draft, May 2003 (hereinafter "the Singer Study").

same prices or the same per channel prices. (*Id.* ¶ 8b, c.)

3. The data does not show that Comcast's behavior led to higher prices because 11% of the putative class members experienced a decrease in per channel price, with nearly 50% experiencing smaller increases in price per channel than did subscribers in the United States as a whole. (*Id.* ¶ 8d.)

Besen also takes issue with Beyer's assertion that the supra-competitive overcharge and supra-competitive rate of price increase are feasible methodologies for estimating damages for the class, opining that Beyer implicitly assumes that overbuilder competition would necessarily have occurred but for Comcast's clustering strategy, while in reality the data only shows that the formation of the Philadelphia cluster may have affected the likelihood that overbuilding would have occurred and other data not addressed by Beyer indicates that overbuilding has little or no effect on rates. (*Id.* ¶¶ 9, 10.)

Besen opines that Beyer's assertion that owners of acquired cable systems were potential overbuilder entrants into areas served by Comcast—and thus potential constraints on price and service offerings—is flawed because entry into cable television requires substantial irreversible investment by a potential overbuilder.[7] (*Id.* ¶¶ 16–17.) Because neighboring systems are unlikely to be actual entrants into an already serviced area, the potentiality of their entrance is unlikely to have affected the prices paid by cable subscribers. (*Id.* ¶ 18.) Thus, according to Besen, overbuilding is very rare,[8] overbuilders have to offer a wider array of services in order to achieve economic success at lower rates of penetration for their video services,[9]

and overbuilders have not been successful to date. (*Id.* ¶ 23.) Thus, Plaintiffs' theory that the elimination of potential overbuilders had an adverse impact on competition, is unfounded.

Besen also faults Beyer's reliance on the Singer study, which he contends is inapposite because it relates an area's "cluster value"— the population of the coverage area and contiguous areas—to the likelihood that overbuilding will occur, finding an inverse relationship between the size of the cluster and the likelihood of overbuilding. Besen notes that the Singer study found that overbuilding did not occur where the incumbent operator had upgraded to digital service, and that the most widely reported cases of overbuilding did not involve adjacent operators. (*Id.* ¶ 24.) He also faults Beyer's reliance on government studies of the cable industry that found that overbuilding constrained prices because the studies do not distinguish between overbuilding within cable systems of different sizes. His own study concluded that most subscribers were served by large systems for which the estimated competitive differentials were "not significantly different than zero." (*Id.* ¶ 25.) In other words, since the data shows that actual competition does not significantly affect prices charged by large cable systems, or those in metropolitan areas, potential competition—the theory used by Beyer—would have an even less likely effect. (*Id.* ¶ 27.)

As for the cable system transactions at issue in this suit, Besen asserts that the effects are likely to differ among the class members based on differentiation in a number of factors including: the time points when the acquired systems joined the Philadelphia cluster;[10] when the acquired system

---

7. The investment is "sunk" because if the overbuilder decides to abandon the market there is no ability to transfer the duplicative assets. (*Id.* ¶ 17.)

8. Besen asserts that only 3% of communities have effective competition and only about 1.5% of subscribers are served by overbuilders. (*Id.* ¶ 21.)

9. He identifies retail and wholesale telephone service, business service and internet service as the extra services. (*Id.* ¶ 23.)

10. He reports that, of the six cable transactions, two occurred before the Class period, one closed one month into the Class period, one closed one year after the start of the Class period, and one closed 16 months after the start of the Class period. Although Besen claims the time the subscriber came to Comcast makes a difference, we note that he does not explain how. (*Id.* ¶ 39.)

upgraded to digital;[11] whether the acquired systems were geographically proximate to the acquiring operator;[12] and which one of the four Comcast geographic regions—which had substantial autonomy—acquired the system.[13] He contends that these factors, particularly the digital upgrade factor, show that the cable transactions would not affect the probability of overbuilding.

While Beyer argues that clustering has anticompetitive effects, Besen asserts that clustering produces efficiencies of scale (which, he asserts, are also likely to differ among class members). Clustering permits Comcast customers to experience the economic benefits of digital phone and internet service because Comcast is able to spread the fixed costs of the services among a larger number of subscribers. (*Id.* ¶ 49.)

Besen next takes issue with Beyer's assertion that all class members received essentially the same services. He contends that Beyer ignored the variety of products Comcast offers and its "associated penetration rates." (*Id.* ¶ 51.) Beyer only analyzed "preferred basic service" while 35–40% of customers subscribe to digital packages and about 40% subscribe to at least one premium service. Limiting his focus to enhanced basic cable, as did Beyer, Besen made the same calculation of the proportion of customers that paid prices 5% above or below the mode of distribution of preferred basic cable prices,[14] however he augmented Beyer's data with information on the number of preferred basic channels offered by each system in the Philadelphia cluster,[15] and he "weighted" Beyer's analysis—which only used community level data—by the number of subscribers in each community to arrive at subscriber level data.[16] (*Id.* ¶¶ 52–54.)

Using Beyer's community level analysis and data, Besen found that in 2004, 33% of Comcast communities had prices more than 5% above or below the modal price,[17] 38% of communities had channel offerings that were more than 5% from the modal number of channels offered,[18] and 4% of communities had prices per channel that were more than 5% from the modal price per channel.[19] Besen opines that these statistics indicate, contrary to Beyer's opinion, that all Comcast customers did *not* pay essentially the same price for preferred basic cable.[20] (*Id.* ¶¶ 55–57.) Using his own subscriber level method with Beyer's data, Besen found that the percent of subscribers paying prices more than 5% above or below the modal price was 48%

---

**11.** This distinction is based on the Singer study's finding that upgrading to digital impacted overbuilding. (*Id.* ¶¶ 40–42.)

**12.** Because Beyer based his opinion on the premise that the most anticompetitive acquisitions are those of systems in close proximity, Besen opines that Beyer's failure to account for differences in proximity and focusing on "average" effect, gives a misleading picture. (*Id.* ¶¶ 43–45.)

**13.** Some of the regional distinctions Besen notes are budgeting, billing, allocation of personnel, engineering initiatives, governmental affairs and public relations, call centers and technical operations centers. He opines that differences in these functions can result in differences in offerings to subscribers. (*Id.* ¶ 46.) However, he does not opine that they actually have resulted in differences.

**14.** We assume that Dr. Besen uses "mode" in the sense of "the most frequent value of a set of data." *See* http://mw1.merriam-webster.com/dictionary/mode.

**15.** The data came from Comcast's rate cards for each of the franchises in the cluster for year 2005. (*Id.* ¶ 61.)

**16.** Besen opines that subscriber level data is more appropriate because using community level data gives each community the same weight regardless of the number of subscribers they contain, which differs widely. (*Id.* ¶ 54.)

**17.** In 2006, the number had dropped to 22%. (*Id.* ¶ 55.)

**18.** In 2006, this number dropped to 32%. (*Id.* ¶ 56.)

**19.** In 2006, this number had risen to 21%. (*Id.* ¶ 57.) Besen does not explain how, if the deviation from mode was declining over time in both categories that make up the price per channel, the deviation in price per channel increased.

**20.** At his deposition, Besen was cross-examined on his use of price per channel data. He admitted that cable MSOs negotiate with channel providers individually and pay for the channels based on their value to the MSOs. However, in doing his analysis, Besen treated each channel equally and did not consider the relative value of the channels that were offered in different franchise areas. (Besen Dep. 40:24–42:6.)

in 2004 and 31% in 2006. The percent of subscribers that had channel offerings that were more than 5% from the modal number of channels offered was 19% in 2004 and 13% in 2006. The percent of subscribers that had prices per channel that were more than 5% from the modal price per channel was 73% in 2004 and 41% in 2006. (*Id.* ¶ 59.) Finally, when using his own subscriber level method with his augmented data for year 2005, Besen found the percent of subscribers paying prices more than 5% above or below the modal price was 35%, the percent of subscribers that had channel offerings that were more than 5% from the modal number of channels offered was 34%, and the percent of subscribers that had prices per channel that were more than 5% from the modal price per channel was 59%. (*Id.* ¶ 62.) Besen opines that these statistics more clearly indicate that all subscribers did not pay essentially the same price for Expanded Basic cable.[21]

Besen next challenges Beyer's finding that the named Plaintiffs are typical of the class as a whole. As he points out, Plaintiff Glaberson lives in a Comcast "legacy" area,[22] and has been purchasing HBO and high-speed internet service. Meanwhile, Plaintiff Behrend lives in a former Lenfest area, and purchases digital cable with video on demand service, as well as high-speed internet service. Besen's data for 2005 shows that 12% of subscribers paid prices for preferred basic cable that were more than 5% different from the prices paid by the named Plaintiffs. (*Id.* ¶ 70.) The more than 5% variation in number of channels was 24%, and the more than 5% variation in price per channel was 30%. (*Id.*) Beyer's data for 2006 shows that 24% of subscribers paid prices for preferred basic cable that were more than 5% different from the prices paid by the named Plaintiffs. (*Id.* ¶ 71.) The more than 5% variation in number of channels was 3%, and the more than

5% variation in price per channel was 59%. (*Id.*) Because of these statistical variations between the named Plaintiffs and the class as a whole, Besen opines the named Plaintiffs are not representative.

Besen next challenges Beyer's methods for calculating damages, which he asserts ignore the complexities of applying a common methodology to the class. Essentially, he asserts that the differentiations in the class that he identifies make any common methodology for damages impossible because the effects of clustering on the probability of overbuilding and the effects of overbuilding on price differ among the acquired cable systems. (*Id.* ¶ 72.) He also faults Beyer for his implicit assumption that overbuilding *necessarily* would have occurred in the absence of clustering because the basis for the assumption—the Singer study—showed only that clustering may have affected the *likelihood* of overbuilding competition, not that overbuilding would certainly have occurred. (*Id.* ¶ 74.)

Because overbuilding is rare, Besen concludes that it is highly unlikely that the cable transactions at issue had any significant effect on the probability of overbuilding. (*Id.* ¶ 78.) He also concludes that the substantial variation in prices, channels and prices per channel that he reports indicate that the proposed class is too differentiated and the named Plaintiffs are not suitable class representatives. (*Id.* ¶¶ 79–80.)

### 3. Beyer's Rebuttal

Beyer has submitted a Declaration in response to Besen's report, identifying flaws in Besen's conclusions regarding the lack of common impact on the class and lack of common damages. Beyer opines that Besen misunderstood and mischaracterized his anal-

---

21. Based on this data, Besen also takes issue with Beyer's opinion that the price subscribers pay for Expanded Basic cable has increased as a consequence of Comcast's increased market power. He finds from his data that experiences of class members have not been the same during the class period, with 47% of subscribers, covering about half of the Rate Card areas, experiencing smaller increases in price per channel than the United States as a whole as shown by comparing the data with the Cable and Satellite

Consumer Price Index created by the Bureau of Labor Statistics (see *id.* ¶ 63), suggesting that a substantial portion of the class may, in fact, have benefitted from the cable system transactions. (*Id.* ¶¶ 63–65.)

22. Meaning her community had always been serviced by Comcast, rather than by an acquired system.

ysis on common impact as based on the assumption that but for the anticompetitive activity, all of the Philadelphia cluster would have been overbuilt, thereby mistakenly focusing on an assessment of the probability of overbuilding rather than the relevant question, which is whether all member of the class have paid higher prices as a result of the cable transactions.[23] (Besen Decl. ¶ 3i.) Beyer opines that Besen misunderstood and mischaracterized his analysis of common damages because Besen used the Cable and Satellite CPI—an index that includes the price for premium channels, equipment and installation services—to show that some class members had a reduced price per channel cost, while ignoring the most appropriate benchmark—the change in average monthly prices for Expanded Basic cable reported by the FCC—which clearly shows the increased prices in the Philadelphia cluster.[24] (*Id.* ¶ 3iii.) Besen also used price per channel as his benchmark, which Beyer criticizes as an artificial measure because neither Comcast, any other cable operator, nor the FCC uses it as a measure for evaluating prices of expanded basic cable. (*Id.* ¶ 3iv.)

### C. *The Requirements of Rule 23(a)*

To be certified as a class, plaintiffs must satisfy Federal Rule of Civil Procedure 23(a). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Commonly referred to as numerosity, commonality, typicality, and adequate representation, these four require-

ments are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994).

#### 1. Numerosity

■ "Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." *Newton,* 259 F.3d at 182; Fed.R.Civ.P. 23(a)(1). "No single magic number exists satisfying the numerosity requirement." *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). However, the Third Circuit generally has approved classes of forty or more. *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001).

We find that the numerosity requirement of Rule 23(a)(1) is clearly satisfied in this case. Plaintiffs allege that the number of individuals in the putative class exceeds two million based on Comcast's 2005 Annual Report estimating its cable subscribers in the Philadelphia market at 1.8 million. (Pl. Mem. at 6.) The number of individuals in the putative class would make joinder of all members impracticable. Comcast does not argue that the class fails to meet the numerosity requirement. Accordingly, we find that this requirement has been satisfied.

#### 2. Commonality

■ To satisfy the commonality requirement, plaintiffs must show the existence of at least one question of law or fact common to the class. Fed.R.Civ.P. 23(a)(2); *Johnston,* 265 F.3d at 184. "Commonality does not require an identity of claims or facts among class members; instead, the commonality requirement will be satisfied if the named plaintiffs share at least one common question of fact or law with the grievances of the prospective class." *Johnston,* 265 F.3d at 184 (*quoting In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 310 (3d Cir.1998)) (internal quotations omitted).

---

**23.** The "mistake," according to Beyer, was that Besen examined only whether all class members paid the same prices, rather than whether they all suffered the same injury of paying higher prices due to the anticompetitive cable transactions. (*Id.* ¶ 3ii.)

**24.** It should be noted that Beyer himself cites the Cable and Satellite CPI in his own report to support his opinion that prices for cable have increased substantially during the class period. (Beyer Decl. ¶ 14.)

"All that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory." *Baby Neal,* 43 F.3d at 58. With respect to the related criteria of commonality and typicality, the Third Circuit has recognized that courts have "set a low threshold for satisfying both requirements." *Newton,* 259 F.3d at 183.

Plaintiffs assert that they have identified numerous common questions of law and fact including:

- whether Comcast's conduct in entering into the agreements allocating markets with competitors violates Sherman Act § 1, including as a per se violation;
- whether its acquisitions of competitor cable companies and subscribers in Philadelphia and Chicago constitute contracts and conduct in restraint of trade in violation of Sherman Act § 1;
- whether its possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize, the Philadelphia and Chicago markets violates Sherman Act § 2;
- whether its conduct caused prices for cable to be artificially high and non-competitive;
- whether Plaintiffs and the class were injured by Comcast's conduct;
- the measure of damages by which its conduct injured Plaintiffs and the class; and
- whether Plaintiffs and the class are entitled to injunctive relief.

(Pl. Mem. at 7–8.)

Although Comcast raises significant arguments under Fed.R.Civ.P. 23(b), that common questions do not predominate, it does not argue that there are no common questions. Accordingly, we find the commonality requirement has been satisfied.

3. Typicality and Adequacy of Representation

■ To satisfy typicality, "the claims of the class representatives must be typical of the class as a whole." *Johnston,* 265 F.3d at 184. In other words, Plaintiffs must show that they have legal interests such that pursuit of their own goals will benefit the entire class. *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). Typicality "entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988) (citations and internal quotations omitted).

Even if there are pronounced factual differences among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiffs do not have unique circumstances. *See Johnston,* 265 F.3d at 184 ("Indeed, so long as the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences.") (internal quotations omitted); *Baby Neal,* 43 F.3d at 58 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice."); *Hoxworth v. Blinder, Robinson & Co. Inc.,* 980 F.2d 912, 923 (3d Cir.1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory."). Typical does not mean identical, and if necessary a court may sever claims or use subclasses to treat individual issues separately. *Eisenberg,* 766 F.2d at 786.

Class representatives must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequate representation requirement of Rule 23(a)(4) guarantees "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449

(3d Cir.1977). Adequacy of representation depends on the circumstances surrounding each case. *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir.1975). The burden is on the defendant to prove that the representative plaintiffs will not adequately represent the class. *See Shamberg v. Ahlstrom*, 111 F.R.D. 689, 693 (D.N.J.1986); *see also Lewis v. Curtis*, 671 F.2d 779, 788–89 (3d Cir.1982). The Court must therefore determine "whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." *Johnston*, 265 F.3d at 185.

Plaintiffs argue that the antitrust claims are based on the same legal theories as those of all class members, and arise from the same course of conduct that underlie the class claims. (Pl. Mem. at 11–12.) Thus, they satisfy typicality. They argue that their counsel has sufficient expertise and that their own interests are not antagonistic to the class, thus satisfying the adequacy of representation requirement. (*Id.* at 13.)

Comcast takes strong issue with Plaintiffs' typicality and adequacy, based on its interpretation of the class claims. Plaintiffs, it asserts, are claiming that, prior to the cable transactions at issue, Comcast's prices were constrained by the presence of other wireline cable operators in the Philadelphia cluster, which acted as potential overbuilders to restrain prices. Comcast argues that, because the two named Plaintiffs live in close proximity to each other, and to the old Comcast/Lenfest border, they have an incentive to argue that (1) Comcast is liable for eliminating physically proximate cable systems, and (2) subscribers with proximity to a border between two systems were injured to a greater extent and are entitled to a greater recovery. Thus, Comcast continues, the named Plaintiffs have an incentive to emphasize the proximity argument whereas the class members as a whole were not located near a border and cannot benefit from this argument.[25] These "diverging interests," Comcast argues, show that the class is too big and that the named plaintiffs are not typical of, and cannot adequately represent, all its members.[26]

We do not agree. Typicality bars a "marked difference" between the class and the named plaintiff's individual circumstances or legal theory. Factual differences—such as living in the middle of a franchise area versus living near a border, or having your cable rate rise at a different rate than others—are insufficient to defeat typicality so long as there is a strong similarity of legal theories and the named plaintiffs do not have unique circumstances. We perceive no reason how living near a border can create antagonism between the named Plaintiffs and the class when the Plaintiffs do not themselves seek to differentiate their damages based on proximity. Plaintiffs claim that they are merely passive victims of Comcast's alleged anticompetitive activity. Differentiation among cable subscribers subjected to anticompetitive conduct is no different, for example, from differentiation among the passengers on a doomed airplane. They all may have unique economic factors relevant to their damages, but they all have common causation questions.

Comcast's expert, Dr. Besen, opined that there is no typicality because his data suggests that a significant number of subscribers were unaffected by the formulation of the Philadelphia cluster and, therefore, faced lit-

---

25. In other words, it would be easier, in Comcast's view, for a subscriber near a border to argue that the proximity of the neighboring provider has a constraining effect on Comcast's prices than would a subscriber in the middle of an extant Comcast franchise.

26. The argument is based on Besen's variation statistics recited *supra*. Besen's data for 2005 shows that 12% of subscribers paid prices for expanded basic cable that were more than 5% different from the prices paid by the named Plaintiffs. (*Id.* ¶ 70.) The more than 5% varia-

tion in number of channels was 24%, and the more than 5% variation in price per channel was 30%. (*Id.*) Beyer's data for 2006 shows that 24% of subscribers paid prices for expanded basic cable that were more than 5% different from the prices paid by the named Plaintiffs. (*Id.* ¶ 71.) The more than 5% variation in number of channels was 3%, and the more than 5% variation in price per channel was 59%. (*Id.*) Because of these statistical variations between the named Plaintiffs and the class as a whole, Besen opines the named Plaintiffs are not representative.

tle or no possibility of overbuilding by a neighboring MSO. He also opined that the probability of overbuilding varied among subscribers based on their location. However, Plaintiffs' expert, Dr. Beyer, opined that all class members in the cluster—presumably including the named Plaintiffs—are similarly impacted by Comcast's pricing decisions, with each paying the same price for Expanded Basic, that price becoming common under Comcast ownership, and having increased as a consequence of Comcast's increased market power.[27] As it is not necessary for the Plaintiffs to establish the merits of their case at the class certification stage, Dr. Beyer's opinion that all class members were similarly impacted by the elimination of possible overbuilders is sufficient to establish typicality and adequacy of representation.[28]

### D. Rule 23(b)

▆▆▆ In addition to satisfying Rule 23(a), Plaintiffs must show that the putative class falls under at least one of the three subsections of Rule 23(b). In this case, Plaintiffs assert that the proposed class qualifies under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3) (emphasis added). To assist in this inquiry, Courts should consider: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a

class action." *Id.* The Advisory Committee Note adds that "[p]rivate damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions."

### 1. Predominance of Common Questions

The Rule 23(b)(3) requirement that common issues predominate ensures that a proposed class is "sufficiently cohesive to warrant certification." *Newton,* 259 F.3d at 187. The predominance requirement of Rule 23(b) is more rigorous than the commonality requirement of Rule 23(a). *See Amchem Prods., Inc.,* 521 U.S. at 625 (holding that although a proposed class of asbestos plaintiffs shared the goal of reaching a settlement, the commonalities did not predominate over individual questions of causation regarding each plaintiff's degree of asbestos exposure under different conditions, pre-existing medical conditions, and tobacco use); *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 68 (4th Cir.1977) ("[W]here the issue of damages and impact ... requires separate mini-trials ... courts have found that the staggering problems of logistics thus created make the damage aspect of the case predominate, and render the case unmanageable as a class action.") (internal citations omitted).

"Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Community Bank of Northern Virginia,* 418 F.3d 277, 306 (3d Cir.2005) (quoting *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir.2001)). "Rule 23(a)(2)'s *commonality* element requires that the proposed class members share at least one question of fact or law in common with each other." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527–28 (3d Cir.2004) (emphasis added). The *predominance* ele-

---

**27.** He also criticized Dr. Besen's focus on the probability (or lack thereof) of overbuilding rather than what he saw as the relevant question, whether all members of the class have paid higher prices as a result of the cable transactions.

**28.** For a similar reason, we find that Comcast's alternate argument—that named Plaintiffs Behrend and Glaberson are atypical because Glaberson experienced smaller increases in prices per

channel than subscribers in the United States as a whole, and Behrend actually experienced a decrease—must be rejected. Dr. Beyer rejects price per channel as an artificial measure because it is not used by the industry. In his opinion, based on the change in average monthly prices for expanded basic cable reported by the FCC, Glaberson and Behrend experienced increased prices due to the cable transactions.

ment, in turn, requires that the common issues predominate over issues affecting only individual class members; it incorporates the commonality element but is more demanding. *Id.* at 528. Common issues must constitute a "significant part" of the individual cases. *Chiang v. Veneman,* 385 F.3d 256, 273 (3d Cir.2004). "The presence of individual questions as to [each class member] does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by Rule 23(b)(3)," *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985), however, the Third Circuit has found that "there are cases where the question of damages is so central that it can, in some sense, overtake the question of liability." *Chiang* at 273 (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir.1977)).

### 2. Superiority

The requirement that a Section (b)(3) class action be the "superior" method of resolving the claims ensures that there is no other available method of handling it which has greater practical advantages. *See* Fed. R.Civ.P. 23, Advisory Committee Note, 1966 Amendment to 23(b)(3); *Johnston,* 265 F.3d at 194 ("A class action must represent the best available method for the fair and efficient adjudication of the controversy."). "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant.... Superiority must also be looked at from the point of view of the issues." *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 760 (3d Cir.1974). Courts must address "the difficulties likely to be encountered in the management of a class action," Fed.R.Civ.P. 23(b)(3)(D), and may consider alternatives to class certification, such as holding separate trials with combined discovery or certifying the class with respect to liability but not damages. *See Johnston,* 265 F.3d at 194.

### 3. Plaintiffs' arguments on predomination and superiority

Plaintiffs assert that common issues predominate because they can prove their Sherman Act § 1 conspiracy and § 2 monopolization claims by relying on the cable transaction agreements to show that Comcast's conduct affecting all class members, specifically the acquisition of competitor cable companies, was an attempt to allocate the market and monopolize. (Pl. Mem. at 15–16.) Relying on Dr. Beyer's opinions, they also argue that there is a common antitrust injury resulting from that conduct because Comcast's conduct caused the class to pay higher cable prices than they would have paid absent Comcast's antitrust violations. (*Id.* at 19.) They assert that Beyer's opinions provide the basis for common injury because he opines that:

- Comcast has dominant market power in the Philadelphia and Chicago clusters.

- Class members are impacted by its cable pricing practices.

- Comcast's cable price increases have been essentially the same across the Philadelphia and Chicago clusters.

- Comcast's subscribers would all benefit from effective competition in the form of lower cable prices.

- Thus, all members of the proposed class have been adversely affected by Comcast's unlawful conduct.

- The supra-competitive overcharge and the supra-competitive rate of price increase are accepted methodologies available to quantify damages on a class-wide basis.

(Pl. Mem. at 19–20, quoting Beyer Declaration at ¶¶ 22–40.) Plaintiffs also assert that the class action is a superior method of adjudicating the claims because it is the only practical means the class members have to litigate their claims given the large up-front cost needed to prosecute this antitrust suit. They also assert that, in light of the size of the class, certification will promote judicial economy while presenting no significant manageability problems.

### 4. Comcast's arguments on predominance and superiority

Comcast argues that Plaintiffs cannot show antitrust injury through common proof be-

cause they cannot establish that any acquired company could or would have entered a specific franchise area, and was *perceived* by Comcast as a threat to do so. (*Id.* at 12.) Comcast argues that the Plaintiffs would have to show that a competitor could have *actually* obtained franchises, built a cable system and begun competing in all communities simultaneously in order to show common proof of injury.[29] (*Id.* at 12–13.)

### 5. Discussion

#### (a.) Potential competition

In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) and *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Supreme Court theorized that two kinds of potential competition were implicated in the reach of Clayton Act § 7, which prohibits mergers and acquisitions by one company of another if "the effect of such acquisition may be substantially to lessen competition." Under the first theory, "perceived potential competition," the Supreme Court held that competition might be diminished if a company that industry participants had thought might actually enter the market on its own, instead simply acquired a company already in that market. *See Marine Bancorporation*, 418 U.S. at 625, 94 S.Ct. 2856 ("[T]he Court has interpreted § 7 as encompassing what is commonly known as the 'wings effect'—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter de novo.... The elimination of such present procompetitive effects may render a merger unlawful under § 7."). Under these cases, "perceived potential competition focuses on the premerger effect on prices of the perception that if profits rise, a new company will enter the market and drive down both prices and profits." *Alberta Gas Chemicals*

*Ltd. v. E.I. Du Pont De nemours and Co.*, 826 F.2d 1235 (3d Cir.1987).

A second kind of potential competition, which has been called "actual potential competition," was discussed in *Marine Bancorporation*. The Court observed that it

has not previously resolved whether the potential competition doctrine proscribes a market extension merger solely on the ground that such a merger eliminates the prospect for long-term deconcentration of an oligopolistic market that in theory might result if the acquiring firm were forbidden to enter except through a de novo undertaking or through the acquisition of a small existing entrant (a so-called foothold or toehold acquisition). *Falstaff* expressly reserved this issue.

*Marine Bancorporation*, 418 U.S. at 625, 94 S.Ct. 2856 (footnote omitted). The actual potential competition doctrine has not received a clear stamp of validity from the Supreme Court, but other courts have applied it where the plaintiff can show: (1) that the relevant market is oligopolistic; (2) that absent the acquisition [of the incumbent cable operator], the acquiring company [Comcast] would likely have entered the market in the near future either de novo or through a toehold acquisition; and (3) that such entry by the acquiring company [Comcast] would carry a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects. *Tenneco, Inc. v. FTC*, 689 F.2d 346, 352 (2d Cir.1982) (*citing Marine Bancorporation*, 418 U.S. at 630, 633, 94 S.Ct. 2856).

The theory of perceived potential competition holds that "competition might be diminished if a company which industry participants had thought might actually enter the market on its own instead simply acquired a company already in that market.... The actual potential competition doctrine concerns the elimination of a company which

---

**29.** Comcast also states that Plaintiffs cannot show common proof of injury because the cable transactions involved seven different cable providers, operating in different franchise areas, serving different subscribers; there was no overlap among the franchise areas and they did not compete head-to-head with each other; and thus,

no transaction reduced any subscriber's existing choice among cable providers since none of the transactions eliminated a provider that was actually offering service to subscribers in head-to-head competition with Comcast. (Def. Mem. at 11–12.)

would otherwise have entered the market either by itself or by acquiring a small company and infusing capital into it. Actual potential competition relates to the effect such a new entry—and its elimination—would have had on prices." *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours and Co.*, 826 F.2d 1235, 1254 (3d Cir.1987) (Becker, C.J., dissenting).[30]

Comcast argues that Dr. Beyer's opinion does not distinguish between perceived and actual potential competition. We agree that he opines only that Comcast's actions eliminated potential competitors. *See* Beyer Decl. ¶ 7(b) ("Comcast's building of the Philadelphia and Chicago clusters ... raised entry barriers for potential competitors, including multiple cable system operators, cable companies who previously competed in the Philadelphia and Chicago markets, but were removed from and did not reenter those markets as a result of Comcast's conduct."). However, the discrete class certification issue of predominance does not depend on one or the other potential competition theories to show common proof of antitrust injury. Additionally, Comcast's focus on potential competition is immaterial to the bulk of the predominance issue because it focuses only on a single claim.

In their Complaint, Plaintiffs allege a per se Sherman Act § 1 claim based on market allocation and a rule of reason Sherman Act § 1 claim that the cable transactions amount to contracts and conduct in restraint of trade. (Compl. ¶ 74.) They also allege a Sherman Act § 2 claim of monopolization and attempted monopolization. The attempted monopolization claim is based on anticompetitive conduct not only in the cable transactions, but also in regard to Comcast's (1) refusal to deal with the alleged overbuilder RCN, (2) substantial interference with RCN's access to the contractors needed to build competing cable systems, and (3) engaging in pricing campaigns designed to prevent or destroy

competition from RCN. (Compl. ¶¶ 11–12, 97).

As we read Comcast's potential competition argument, it relates only to the attempted monopolization claim, and only to that portion of the attempted monopolization claim that alleges anticompetitive conduct in the cable transactions (and not with regard to Comcast's conduct vis-a-vis RCN). The argument has no bearing on whether Plaintiffs have shown predominance of common issues on the per se claim, the rule of reason claim, the monopolization claim, or the attempted monopolization claim vis-a-vis RCN.

Plaintiffs have shown, without opposition, that common antitrust liability issues predominate on these claims. The facts that the various cable systems were (1) acquired at different times; (2) covered different franchise areas; (3) did not compete head to head with each other or with Comcast prior to their acquisition; or (4) would have entered a specific franchise area; do not negate Plaintiffs' arguments that the effects of the cable transactions (per se market allocation, unlawful restraint of trade, and monopolization) are common to the class, constitute a significant part of the individual cases, and can be determined on a class-wide basis.

### (b) Comcast's "Market Entry" Argument

In addition to its potential competition argument, Comcast makes a separate predominance argument based on ease of market entry. Comcast argues that it is improper as a matter of economics to merely assume that there will be potential competitors entering the market. (Def. Mem. at 13–14.) It cites to cases establishing that ease of market entry and exit are important factors in determining the likelihood that an outsider will enter a given market. *See Marine Bancorporation*, 418 U.S. at 628, 94 S.Ct. 2856 (holding that ease of entry of an acquiring firm is a central premise of the potential

---

**30.** The elements of an actual potential competition claim are that:

   1. the relevant market is oligopolistic;

   2. absent the acquisition, the acquiring firm would have entered the market in the near future either de novo or through acquisition of a little company; and

   3. such entry by the acquiring firm carried a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects.

*Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 352 (2d Cir.1982), (citing *Marine Bancorp.*, 418 U.S. at 630, 94 S.Ct. 2856).

competition theory). Thus, Comcast contends, courts confronting a theory of potential competition have recognized the importance of evidence that a firm actually has taken steps to enter a market before concluding that the firm is in fact a potential competitor. (Def. Mem. at 14, *citing Tenneco,* 689 F.2d at 352; *Hecht v. Pro Football, Inc.,* 570 F.2d 982, 994 (D.C.Cir.1977); *Brotech Corp. v. White Eagle Int'l. Tech. Group, Inc.,* Civ. A. No. 03–232, 2004 WL 1427136 (E.D.Pa. June 21, 2004)).

In *Tenneco,* the Second Circuit rejected the FTC's finding that Tenneco was an actual potential entrant likely to increase competition in the market for replacement shock absorbers. The record established by the FTC was found to lack substantial evidence supporting the FTC's finding that Tenneco was likely to have entered the market for replacement shock absorbers in the near future, either de novo or through a toehold acquisition. *Id.* at 353. The Court held that the Commission's conclusion that Tenneco "would have entered the market de novo with the aid of a [patent] license absent its acquisition of Monroe is based on the kind of unsupported speculation that the Supreme Court condemned when it warned that we should "remember[ ] that § 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *Id.* at 354 (quoting *Marine Bancorporation,* 418 U.S. at 622–23, 94 S.Ct. 2856) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Because Tenneco did not have the patent license, the FTC's premise that it could have entered the market was found to be improper.

In *Hecht,* the issue confronting the D.C. Circuit was whether the non-class action plaintiffs had standing under § 4 of the Clayton Act to complain of an antitrust violation. A plaintiff has standing under § 4 only if he has been "injured in his business or property" by reason of the defendant's acts. *See* 15 U.S.C. § 15. Plaintiffs, a group of "promoters," were denied a new football franchise for Washington, D.C. The court held that a potential competitor cannot achieve antitrust standing merely by demonstrating his intention to enter a field; he must also demonstrate his preparedness to do so. *Id.* at 994 (holding that indicia of preparedness would include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, such as the consummation of relevant contracts and procurement of necessary facilities and equipment). As the plaintiffs did not demonstrate indicia of preparedness to enter the market, they had no antitrust standing.

In *Brotech,* this Court confronted non-class action claims of attempted monopolization and conspiracy to monopolize involving anticompetitive patent litigation tactics in the area of federally regulated medical devices. In discussing future antitrust injury, we held that a competitor, such as the counterclaim plaintiff before the court, "that has not yet entered the market may also suffer injury but courts require a 'potential' competitor to demonstrate both its intention to enter the market and its preparedness to do so." *Id.* at *5 (citing *Hecht* at 994.) We went on to find that, as the Amended Complaint did not allege facts establishing the counter-claim plaintiff's intent and preparedness to enter the market for its product, or that government approval of its product was probable, the Amended Counterclaim was insufficient to state an antitrust injury.

Comcast argues that, as Dr. Beyer admits that none of the counterparties to the cable transactions had ever entered a franchised cable provider's area as a overbuilder, his opinion that the counterparties were competitors waiting in the wings to enter Comcast's territory *is a theoretical fabrication.* This argument ignores the fact that Dr. Beyer opined that potential overbuilders include not only the former incumbent cable operators, but also independent competitors, such as RCN. While the intent and preparedness of overbuilders to enter the market will clearly be in issue at trial, the fact that the counterparties to the cable transactions never attempted in the past to enter a Comcast franchise area does not, we find, negate common proof of this attempted monopolization issue. We must give Plaintiffs adequate opportunity to develop their case that the prior incumbent operators could have—absent Comcast

acquiring them—entered a Comcast area as an overbuilder. On the record presented, at least two of the three indicia of preparedness recognized in *Hecht*, experience in the field and financial capacity, may be inferred given that the incumbent operators were in the same business and were on-going concerns. The third indicia, affirmative steps toward entry, has not however been argued by Plaintiffs in their Brief. Nonetheless, we find that Comcast's market entry argument does not lead to a conclusion that individual issues predominate over common issues.

### (c.) Dr. Beyer's Use of the Singer Study

Besen faults Beyer for his "implicit assumption" regarding the attempted monopolization claim that overbuilding *necessarily* would have occurred in the absence of clustering because the basis for the assumption—the Singer study—showed only that clustering may have affected the *likelihood* of overbuilding competition, not that it would certainly have occurred. (Besen Decl. ¶ 74.) We disagree. Beyer used the Singer study in his discussion of the common impact to the class, citing it for the proposition that an increase in the size of a cluster significantly decreases the probability of overbuilder activity. (Beyer Decl. ¶ 28.) However, the gist of Beyer's opinion is not that overbuilding would have necessarily occurred but for the cable transactions. Rather, his opinion is that all members of the class have paid higher prices as a result of the effects of the cable transactions. In arriving at this opinion, he does not focus on an assessment of the probability of overbuilding. He looked, rather, to Comcast's use of market power in

the Philadelphia and Chicago markets, as a consequence of its building clusters of cable systems, which increased its monopoly power *and* raised entry barriers for potential competitors and overbuilders (i.e., Beyer's opinion on common proof related to the per se, rule of reason, and monopolization claims, as well as the attempted monopolization claim). As Comcast does not argue that its alleged use of market power is not a predominate common issue, we find that predomination has been established as to these issues.

### (d.) Dr. Beyer's Prior Testimony as an Expert

Comcast also argues that we should reject class certification because Dr. Beyer's opinions have been rejected by other courts. *See In re Agric. Chems. Antitrust Litig.*, Civ. A. No. 94–40216, 1995 WL 787538 (N.D.Fla. Oct. 23, 1995) (rejecting Beyer's opinion on class impact because "nowhere does Dr. Beyer ever demonstrate what even plaintiffs acknowledge is the *sine qua non* of class-wide proof of impact: 'damage to each class member' because the prices charged by [defendant]'s distributors were higher than the range which would have existed under competitive conditions. Rather, Dr. Beyer merely assumes that such an overcharge took place....") (footnotes omitted); [31] *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir.2002) (criticizing Beyer for basing his economic opinions regarding the computer software product market on merely his own personal experience as president of a consulting firm which installed a new network operating system and for "attempt[ing] to spin anecdotes from a handful of personal experi-

---

31. Beyer was retained by plaintiffs " 'to determine whether the alleged [antitrust] conspiracy ... would have impacted all purchasers' of [defendant]'s agricultural chemicals.... To do so, Dr. Beyer tells us that he took as a given that the conspiracy alleged by plaintiffs 'actually occurred and operated' as plaintiffs allege." *Id.* at *5. He was faulted by the court for concluding that the putative members of the nationwide class paid an "artificially elevated" price, while offering no systematic way of determining, on any class-wide basis, the price each member would have paid in the absence of the alleged conspiracy. *Id.* at *7.

The court criticized Beyer for failing to (1) compare the prices reported by the defendant's

distributors to the marketplace prices for other manufacturers' products that competed with the defendant's product being sold, (2) compare the prices reported by the distributors to prices charged before and after the supposed conspiracy took place, (3) compare the defendant's qualifying prices to the marketplace prices of its competitors' products, (4) consider whether the defendant even had sufficient market power to "get away with" having its distributors sell its products above the competitive level, and (5) consider the variety of factors impacting on prices charged for the mix of services and products purchased by dealers or farmers. *Id.* at *6.

ences into evidence of a worldwide product market");[32] *Blue Cross and Blue Shield of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir.1998) (Judge Posner criticizing Beyer's reports on range of damages from the alleged allocation of markets as "worthless" because they attributed the entire difference between the prices of the defendant and the prices of competitors to the division of markets, with no correction for any other factor).[33] Plaintiffs respond that Dr. Beyer has been qualified as an expert in at least eight antitrust cases. (*See* Pl. Mem. at 20–22.)

It is correct that Beyer assumed as true that "the facts and antitrust violations alleged in the Plaintiffs' Complaint did in fact occur." (Beyer Decl. ¶ 8.) However, we find that Beyer did not make improper assumptions in his analysis of common impact. His opinions (1) that the expanded basic cable product supplied was essentially the same for all Class members, (2) that the price for expanded basic cable became common under Comcast ownership, and increased as a consequence of Comcast's increased market power, (3) that the price increases had been nearly the same across all systems in each cluster, and (4) that subscribers would commonly benefit from effective competition, were based on:

- FCC pricing data and the Cable and Satellite CPI (Beyer Decl. ¶ 14),

- Comcast's own website showing channel offerings showing the product was essentially the same (*Id.* ¶¶ 24–25),

- Nielsen data on Comcast's share of cable subscribers (and, hence, market power) in each cluster,

- the Singer Study showing the decrease in the probability of overbuilding relative to the increase in size of a cluster (*Id.* ¶ 28),

- a study showing that an increase in the number of cable systems owned by a MSO was associated with higher monthly prices (*Id.*),

- a Government study showing a positive and statistically significant relationship between a cable operator's affiliation with a large MSO and the average monthly price for service (*Id.*),

- a Government study showing that cable prices are 17% lower in areas where there is a non-satellite competitor (*Id.*),

- and a more generalized economic study that found that the effectiveness of competition in lowering prices is contingent on the "degree of system overlap," which Beyer applied to the cable industry to infer that increasingly large cable system clusters reduce, proportionately, the extent of overbuild overlap, and consequently, the effectiveness of price competition from the overbuilder competitor. (*Id.*)

Thus, unlike in cases where Beyer was criticized, here he succeeded in demonstrating the *sine qua non* of class-wide proof of impact: damage to each class member because the prices charged by Comcast were higher

---

**32.** The procedural posture of the case was the review of the district court's grant of summary judgment and *Daubert* findings—not class certification. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The district court had rejected Dr. Beyer's opinions on the definition of the relevant product market, concluding that "Dr. Beyer did not employ in the courtroom the same level of intellectual rigor that characterizes an expert in the field of economics and industrial organization." *Lantec*, 306 F.3d at 1025. Specifically, the district court stated that Dr. Beyer (1) used unreliable data; (2) did not understand computers or the computer market; (3) testified that the relevant market was determined by consumer purchasing patterns but did not conduct or cite surveys revealing consumer preferences; (4) did not calculate the cross-elasticity of de-

mand to determine which products were substitutes; (5) changed his opinion from the opinion he gave in an earlier expert report; and (6) did not address changes in the computer market. *Id.* Further, the district court found portions of Dr. Beyer's testimony were non-technical in nature and would not assist the jury. *Id.*

The Tenth Circuit focused only on Number (2) and did not discuss Beyer's use of unreliable data or failure to investigate the market.

**33.** Judge Posner held that statistical studies, like the one Beyer submitted, that "fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Marshfield Clinic*, 152 F.3d at 593.

than the range which would have existed under competitive conditions.

Beyer has also provided metrics for evaluating common impact, the supra-competitive overcharge and the supra-competitive rate of price increase. To arrive at the supra-competitive overcharge, Beyer compared Comcast prices with Government and academic statistics from areas with overbuilder competition, showing a 15–20% differential in price. (*Id.* ¶¶ 8, 40.) He also used statistics to determine that the average annual rate of price increase is 10.8% in the Philadelphia cluster and 9.7% in the Chicago cluster, in contrast to 5.8% where cable systems face effective competition. (*Id.* ¶ 41.)

Comcast disputes these findings, asserting that the areas of effective competition examined by Beyer in formulating his results constitute only 2% of franchise areas in the United States. Again, it must be remembered that it is not necessary at the class certification stage for the Plaintiffs to establish the merits of their case. Nor are we conducting a *Daubert* analysis. Comcast's arguments go to the weight to be accorded Beyer's metrics, not to whether Plaintiffs have been able to state a common impact. Accordingly, we conclude that the Plaintiffs have established that common issues predominate and that class action treatment is the superior means of fairly adjudicating the dispute.

## III. Conclusion

We find that Comcast's arguments against class certification must be rejected and that the Philadelphia cluster class should be certified. Plaintiffs have satisfied the four requirements of Fed.R.Civ.P. 23(a) and the predominance and superiority requirement of Rule 23(b). The class definition, as proposed by Plaintiffs, is:

> all cable television customers who subscribe or subscribed at any time since December 1, 1999 to the present to video programming services (other than solely to basic cable services) from Comcast, or any of its subsidiaries or affiliates in Comcast's Philadelphia cluster. The class excludes governmental entities, Defendants, Defen-

dants' subsidiaries and affiliates and this Court.

The Philadelphia cluster is defined by Plaintiffs to mean:

> those areas covered by Comcast's cable franchises or any of its subsidiaries or affiliates, located in Philadelphia, Pennsylvania and geographically contiguous areas, or areas in close geographic proximity to Philadelphia, Pennsylvania, which is comprised of the areas covered by Comcast's cable franchises, or any of its subsidiaries or affiliates, located in the following counties: Berks, Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania; Kent and New Castle, Delaware; and Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and Salem, New Jersey.

We find that these definitions are appropriate. We also find that Plaintiffs Behrend and Glaberson are adequate class representatives and that their counsel should be appointed class counsel. An appropriate Order granting class certification follows.

Finally, Plaintiffs have submitted a proposed Practice and Procedure Order, setting out the responsibilities of co-lead counsel and the manner for service thereon. The Order is in proper form and will be separately entered.

## *ORDER*

**AND NOW,** this day of May 2007, upon consideration of Plaintiffs' Motion for Certification of the Philadelphia Class (Docket Entry 157), all responses thereto and the arguments of counsel at oral argument, **IT IS HEREBY ORDERED** as follows:

1. The Motion is **GRANTED.**

2. The Court **CERTIFIES** the following plaintiff class pursuant to Fed.R.Civ.P. 23(a) and (c)(4)(B):

> All cable television customers who subscribe or subscribed at any time since December 1, 1999 to the present to video programming services (other than solely to basic cable services) from Comcast, or any of its subsidiaries or affiliates in Comcast's Philadelphia cluster. The class excludes govern-

mental entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

For purposes of this class definition, the term "Comcast's Philadelphia cluster" is be defined to mean:

those areas covered by Comcast's cable franchises or any of its subsidiaries or affiliates, located in Philadelphia, Pennsylvania and geographically contiguous areas, or areas in close geographic proximity to Philadelphia, Pennsylvania, which is comprised of the areas covered by Comcast's cable franchises, or any of its subsidiaries or affiliates, located in the following counties: Berks, Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania; Kent and New Castle, Delaware; and Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and Salem, New Jersey.

3. Plaintiffs Caroline Behrend and Stanford Glaberson are **APPOINTED** as representatives of the Philadelphia Class.

4. Pursuant to Fed.R.Civ.P. 23(g), the law firms of Heins Mills & Olson, P.L.C. and Susman Godfrey, L.L.P. are **APPOINTED** Co–Lead Counsel for the Philadelphia Class. The law firms of Kaplan Fox & Kilsheimer L.L.P., Keller Rohrback, L.L.P., and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. are **APPOINTED** to serve on the Executive Committee of Plaintiffs' counsel.

